**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JACANA HOLDINGS I LLC, <br><br> JACANA HOLDINGS II LLC, <br><br> JACANA HOLDINGS III LLC, <br><br> JACANA HOLDINGS IV LLC, <br><br> LEX CLAIMS, LLC, <br><br> MPR INVESTORS LLC, <br><br>      -and- <br><br> RRW I LLC, <br><br>                 Plaintiffs, <br><br>        v. <br><br> THE COMMONWEALTH OF PUERTO RICO, <br><br> ALEJANDRO GARCÍA PADILLA, <br> in his official capacity as Governor of the Commonwealth of Puerto Rico, <br><br> JUAN ZARAGOZA GOMEZ, <br> in his official capacity as Secretary of the Treasury of the Commonwealth of Puerto Rico, <br><br>      -and- <br><br> LUIS CRUZ BATISTA, <br> in his official capacity as Director of the Office of Management and Budget of the Commonwealth of Puerto Rico, <br><br>               Defendants. | Case No. 1:16-cv-_____ (____) <br><br><br><br><br><br><br><br> **COMPLAINT** |

Plaintiffs Jacana Holdings I LLC; Jacana Holdings II LLC; Jacana Holdings III LLC;

Jacana Holdings IV LLC; Lex Claims, LLC; MPR Investors LLC; and RRW I LLC for their

Complaint against Defendants the Commonwealth of Puerto Rico; Alejandro García Padilla, in

his official capacity as Governor of the Commonwealth of Puerto Rico; Juan Zaragoza Gomez,

in his official capacity as Secretary of the Treasury of the Commonwealth of Puerto Rico; and Luis Cruz Batista, in his official capacity as Director of the Office of Management and Budget of the Commonwealth of Puerto Rico; allege as follows:

## NATURE OF THE ACTION

1.      This is an action under the United States Constitution, 42 U.S.C. § 1983, and the Puerto Rico Constitution challenging the application of the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Act No. 21-2016 (the "Act," attached hereto as Ex. A), a statute enacted by the Commonwealth of Puerto Rico, to $3.5 billion in Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A, issued by the Commonwealth in March 2014 (the "2014 GO Bonds").  In issuing the bonds, the Commonwealth availed itself of New York's financial markets, agreed to be bound by New York law, and waived any defense to jurisdiction in the courts of New York.  As a consequence, the Act—which purports to authorize the Governor to declare a moratorium on the payment of principal and interest on the 2014 GO Bonds, along with other debt instruments—cannot validly be applied to the 2014 GO Bonds. The Puerto Rico legislature lacks the legislative authority to modify New York's law of contracts, and New York law does not permit a debtor to convert its absolute and binding obligation to repay the funds it has borrowed into a discretionary option to do so if and when it chooses.  Plaintiffs, holders of a substantial amount of 2014 GO Bonds, are accordingly entitled to a declaration confirming that the Act cannot be enforced with respect to the 2014 GO Bonds.

2.      Even if the Act were not categorically inapplicable to the 2014 GO Bonds, both the United States and Puerto Rico Constitutions would render the Act invalid as applied to the 2014 GO Bonds.  The Act unlawfully impairs the Commonwealth's constitutional and contractual commitments to holders of (i) the Commonwealth's general obligations bonds ("GO

Bonds"), including the 2014 GO Bonds, which were issued by the Commonwealth and backed by a pledge of the Commonwealth's good faith, credit, and taxing power; and (ii) additional bonds issued by certain of its public corporations and guaranteed by a pledge of the Commonwealth's good faith, credit, and taxing power ("GO-Guaranteed Bonds," and together with the GO Bonds, the "Constitutional Debt").   The Puerto Rico Constitution explicitly guarantees that the Constitutional Debt will be paid first, on time, and in full from all of the Commonwealth's available resources—ahead of any and all other expenditures.   The Act, however, purports to authorize the suspension of those payments, in flagrant disregard of Plaintiffs' rights.

3.       The Puerto Rico Constitution is crystal clear that Puerto Rico's Constitutional Debt must be paid before any other expenditures.   Section 8 of Article VI of the Puerto Rico Constitution provides that if Puerto Rico's "available resources" are insufficient to meet all of its desired spending, "***interest on the public debt and amortization thereof shall first be paid***, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."   P.R. Const. Art. VI, Sec. 8 (emphasis added).   This promise of first priority (the "Constitutional Debt Priority Guarantee") has been critical to Puerto Rico's ability to access the capital markets.   It is a fundamental contract and property right and a correspondingly crucial component of the value of Puerto Rico's Constitutional Debt, including the 2014 GO Bonds.

4.       Indeed, when Puerto Rico approached the capital markets in late 2013 to issue the 2014 GO Bonds, Governor García Padilla trumpeted the bonds' constitutionally guaranteed priority.   In an "open letter" reprinted as a full-page advertisement in the October 23, 2013, issue of the Wall Street Journal, Governor García Padilla acknowledged that "[o]ur Constitution gives first priority over all revenues to payments on our general obligation debt," and pledged that

Puerto Rico's government would "do everything necessary for Puerto Rico to honor all of its commitments." *See* Ex. B.

5.      In purporting to authorize the Governor to declare a moratorium on the payment of principal and interest on the Constitutional Debt, even while the Commonwealth continues spending on other, lower priority purposes, the Act attempts to vitiate the Commonwealth's constitutional and contractual promises to holders of the Constitutional Debt.  But there can be no moratorium on obligations that have been granted the absolute highest priority under Puerto Rico's Constitution.

6.      To make matters worse, the Act presumes to erase the constitutionally protected rights of bondholders to pursue otherwise available judicial remedies, including challenges to the constitutionality of the Act itself.  By its terms, the Act would subject bondholders to contempt of court—and possibly punitive damages—for initiating *any* legal proceeding that might result in a "judgment" with respect to a covered debt obligation.  A statute, however, cannot preclude challenges to its constitutionality.

7.      As applied to Puerto Rico's Constitutional Debt, including the 2014 GO Bonds, the Act violates the United States Constitution and the Puerto Rico Constitution, and exceeds the boundaries of the Puerto Rico legislature's authority.  Plaintiffs accordingly seek (a) a declaration that the Act is unenforceable with respect to the 2014 GO Bonds, and (b) an injunction prohibiting the defendants from enforcing the Act with respect to the 2014 GO Bonds, thus respecting the remedy specifically authorized by Puerto Rico's Constitution, which allows holders of Constitutional Debt to obtain an order directing the Secretary of Treasury to make full payment on such debt.

## PARTIES

8.      Plaintiffs Jacana Holdings I LLC; Jacana Holdings II LLC; Jacana Holdings III LLC; Jacana Holdings IV LLC; Lex Claims, LLC; MPR Investors LLC; and RRW I LLC are the beneficial owners of a substantial amount of 2014 GO Bonds.

9.      Defendant the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") is a United States territory.  It is subject to the Constitution and laws of the United States.

10.     Defendant Alejandro García Padilla is Governor of the Commonwealth of Puerto Rico and is being sued in his official capacity.

11.     Defendant Juan Zaragoza Gomez is Secretary of the Treasury of the Commonwealth of Puerto Rico and is being sued in his official capacity.

12.     Defendant Luis Cruz Batista is Director of the Office of Management and Budget of the Commonwealth of Puerto Rico and is being sued in his official capacity.  Pursuant to 23 L.P.R.A. § 104(c), Governor García Padilla may delegate certain authority for implementing payment priorities to Defendant Cruz.

## JURISDICTION AND VENUE

13.     This action arises under the Constitution of the United States, 42 U.S.C. § 1983, and the Puerto Rico Constitution.  This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3), and 1367(a).

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to these claims occurred here, because a substantial part of the property that is the subject of the action (the 2014 GO Bonds themselves, which are held by the Depository Trust Company ("DTC") in New York) is situated here, and

because of the forum-selection clause included in the resolution pursuant to which the 2014 GO Bonds were issued (the "2014 GO Bond Resolution"). *See* ¶ 35, *infra*.

15.    This Court has personal jurisdiction over Defendants on the basis of the forum-selection clause included in the 2014 GO Bond Resolution.  *See* ¶ 35, *infra*.  Puerto Rico is directly bound by that clause, and Defendants García Padilla, Zaragoza Gomez, and Cruz are likewise bound by it because they are closely related to Puerto Rico.  Governor García Padilla signed the 2014 GO Bond Resolution on behalf of Puerto Rico, and pursuant to 23 L.P.R.A. § 104(c), he may delegate (and has, in fact, delegated) certain authority for implementing payment priorities to Defendant Cruz.  Defendant Zaragoza Gomez's predecessor as Secretary of Treasury likewise signed the 2014 GO Bond Resolution.

16.    Defendants are also subject to personal jurisdiction in New York under N.Y. C.P.L.R. § 302(a)(1) because they have transacted business in New York and/or contracted to supply goods or services in New York, including, but not limited to, by issuing bonds subject to the jurisdiction of New York and marketing the bonds to purchasers located in New York. Plaintiffs' claims arise from these activities.

17.    Defendants or their predecessors purposefully chose DTC, a New York corporation, as the registered owner of the 2014 GO Bonds; Defendants sold the 2014 GO Bonds to beneficial owners through the use of New York underwriters; and Defendants caused the 2014 GO Bonds to be delivered to beneficial owners through DTC.  Defendants or their predecessors extensively marketed the 2014 GO Bonds in New York, solicited investments from New York investors, and had substantial additional contacts with New York related to the issuance of the 2014 GO Bonds.

## FACTUAL ALLEGATIONS

I.   **The Commonwealth's Constitutional, Statutory, and Contractual Obligations To Holders Of Its Constitutional Debt**

A.   **Protections For Puerto Rico's Constitutional Debt**

18.     This suit pertains to the 2014 GO Bonds, which are a component of Puerto Rico's Constitutional Debt.  The Constitutional Debt is set apart from all other debt issued by the Commonwealth and related entities by a series of contractual, statutory, and constitutional promises that ensure that the payments on the Constitutional Debt are made promptly when due and, critically, *before* Puerto Rico's expenditures for all other purposes.

19.     The Commonwealth currently has approximately $12.5 billion in GO Bonds outstanding.  The Commonwealth has pledged its good faith, credit, and taxing power for the timely payment of principal and interest on these GO Bonds, which represents an absolute and enforceable obligation to pay the GO Bonds when due, including by raising taxes if necessary to do so.

20.     In addition, Puerto Rico has pledged its good faith, credit, and taxing power to guarantee timely payment on approximately $5.8 billion in additional GO-Guaranteed Bonds.  In the event that the issuing entities fail to make payments on the GO-Guaranteed Bonds, the Commonwealth's guarantee represents an absolute and enforceable obligation to make those payments, including by raising taxes if necessary to do so.

21.     The total amount of Constitutional Debt protected and secured by the Constitutional Debt Priority Guarantee is less than $18.3 billion—only a small portion of the $70 billion figure that Puerto Rico has repeatedly asserted as its total debt load (which figure includes debts not only of the Commonwealth but also of its public corporations, instrumentalities, and municipalities).

7

22.     The GO Bonds and any payments required to be made under the Commonwealth's guarantees of the GO-Guaranteed Bonds constitute "public debt" within the meaning of the Puerto Rico Constitution, and are therefore entitled—in addition to the good faith, credit, and taxing power pledge—to the highest priority among all of Puerto Rico's expenditures.  Section 8 of Article VI provides that if Puerto Rico's "available resources" are insufficient to fund all of its desired spending, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const. Art. VI, Sec. 8.  (The English version of Puerto Rico's Constitution refers to "available revenues," but, as the Commonwealth itself has acknowledged, the word used in the corresponding Spanish text—"recursos"—is more aptly translated as "resources."  *See, e.g.*, Official Statement for Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A, at p. 28.  That phrasing underscores Puerto Rico's commitment to tap all of its financial resources—whether or not they may be described as revenues—to make the required payments on its Constitutional Debt.)

23.     For decades, the absolute priority of the Constitutional Debt has been further recognized in the Puerto Rico statute that defines the remaining "order of priorities" mentioned in Article VI, Section 8 of the Puerto Rico Constitution.  That statute, 23 L.P.R.A. § 104(c), recognizes that Constitutional Debt must be paid first above all other expenditures, even (and especially) when resources are scarce.  "In keeping with Section 8, Article VI," the statute provides a hierarchy of priorities governing the "disbursement of public funds . . . when resources available for a fiscal year are insufficient to cover the appropriations made for that year."  One—and only one—category is given the highest priority:  "[T]he payment of interest and amortizations corresponding to the public debt."  Significantly, "Conservation of public

health," "protections of persons and property," "Public education programs," "Public welfare programs," and pension obligations are given third priority. 23 L.P.R.A. § 104(c). It is only now—in precisely the circumstances contemplated by the Puerto Rico Constitution and Puerto Rico's longstanding statutory "order of priorities"—that Puerto Rico has sought to upend the established priority of its Constitutional Debt. In other words, it has long been settled law that Constitutional Debt is constitutionally required to be paid first in times of scarcity, ahead of even what the government deems "essential services."

24. In addition to the guarantee of first priority for public debt set forth in Article VI, Section 8, the Puerto Rico Constitution provides further safeguards that function to ensure full and timely payment of public debt in times of financial hardship.

25. For example, Article VI, Section 6 of the Puerto Rico Constitution, states:

If at the end of any fiscal year the appropriations necessary for the ordinary operating expenses of the government *and for the payment of interest on and amortization of the public debt* shall not have been made, the several sums appropriated in the last appropriation acts for the objects and purposes therein specified, so far as the same may be applicable, shall continue in effect item by item, and *the Governor shall authorize the payments necessary* for such purposes until corresponding appropriations are made.

(Emphasis added). This provision thus ensures that if the government does not appropriate funds for the payment of interest and principal on the public debt when due, such payments will nonetheless be automatically appropriated. That protection is reinforced by the Puerto Rico statutes authorizing issuance of the Constitutional Debt, which have provided continuous appropriations to fund debt service on the issued bonds. *See, e.g.*, 13 L.P.R.A. §§ 37, 38.

26. Article VI, Section 2 of the Puerto Rico Constitution provides an additional protection for holders of Puerto Rico's public debt by limiting the Commonwealth's capacity to incur debt with this first-priority status, thus ensuring that the Commonwealth will retain the capacity to honor its Constitutional Debt Priority Guarantee. Added to the Puerto Rico

Constitution in 1961 as a condition of Congress's repeal of the debt limitation in the federal

Jones Act, 39 Stat. 951 (1917) (which had continued to govern following the adoption of the

Puerto Rico Constitution in 1952), this provision limits Puerto Rico's ability to issue direct

obligations backed by the Commonwealth's full faith, credit, and taxing power

> if the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bond and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth, shall exceed 15% of the average of the total amount of the annual revenues raised under the provisions of the Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year.

Article VI, Section 2 further states that Puerto Rico may not issue a new guarantee for notes or

bonds

> if the total of the amount payable in any fiscal year on account of principal of and interest on all the direct obligations referred to above theretofore issued by the Commonwealth and then outstanding and the amounts referred to in item (ii) above shall exceed 15 percent of the average of the total amount of such annual revenues.

Accordingly, the Commonwealth may not issue GO Bonds or guarantee the payment of other

debt if doing so would cause (i) debt service payments on GO Bonds plus (ii) actual payments by

the Commonwealth pursuant to guarantees to exceed 15% of Puerto Rico's revenues.

27.     Recognizing that in times of fiscal stress officials may place expediency and

politics ahead of responsible decision making, the Puerto Rico Constitution affords holders of

Puerto Rico's Constitutional Debt express judicial remedies to protect their rights and to bar

Puerto Rico from claiming sovereign immunity or any other defense against enforcement of the

Constitutional Debt Priority Guarantee.  In particular, Article VI, Section 2 of the Puerto Rico

Constitution provides, in pertinent part:

The Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of the Article VI at the suit of any holder of bonds or notes issued in evidence thereof.

28.     The Constitutional Debt Priority Guarantee traces its origins to the Jones Act, which governed the structure of Puerto Rico's insular government prior to Congress's approval of the Commonwealth Constitution in 1952.  Section 34 of the Jones Act established specific payment priorities if "the available revenues . . . for any fiscal year . . . are insufficient to meet all the appropriations made by the legislature for such year."  The very first priority included "interest on any public debt."  Such expenses were thus to be paid first, unless the federally appointed governor of Puerto Rico directed otherwise.

29.     In 1950, Congress enacted Public Law 81-600 ("Public Law 600"), which was "in the nature of a compact so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption."  *Id.* § 2.  Public Law 600 established a process for drafting a proposed constitution.  The constitution would become effective only if approved by Congress, at which point the Jones Act would be amended in certain respects, and renamed the "Puerto Rican Federal Relations Act."  A proposed constitution was drafted over several months spanning 1951 to 1952, pursuant to the process established by Public Law 600.  The proposed constitution contained the Constitutional Debt Priority Guarantee that is still set forth in Article VI, Section 8 of the Puerto Rico Constitution.  Although Congress insisted on several modifications to the draft constitution following extensive hearings on the subject, Congress did not modify the terms of Constitutional Debt Priority Guarantee before approving the Puerto Rico Constitution.  The people of Puerto Rico thereafter ratified the modified constitution.

30.     The Commonwealth's constitutional protections for holders of its Constitutional Debt, including the Constitutional Debt Priority Guarantee, have been critical to Puerto Rico's

ability to access the capital markets on the terms it has.  Without these critical protections for holders of Constitutional Debt, the Commonwealth would have faced significantly higher borrowing costs, and may have been prevented from raising funds altogether.

**B.    The 2014 GO Bonds**

31.    The 2014 GO Bonds consist of $3.5 billion in Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A, issued in March 2014.

32.    In the 2014 GO Bond Resolution, which forms the Commonwealth's contract with holders of the 2014 GO Bonds, the Commonwealth stated that the 2014 GO Bonds were issued "under the authority of the Puerto Rican Federal Relations Act and the Constitution and laws of the Commonwealth." (Section 3.)  In that same resolution, the Commonwealth promised to promptly pay principal and interest on the 2014 GO Bonds.  The 2014 GO Bond Resolution further provides, pursuant to express authorization in the enabling legislation governing the 2014 GO Bonds, that the "good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and the interest on the Bonds authorized by this Resolution."  (Section 19.)  The 2014 GO Bond Resolution also states that the 2014 GO Bonds are protected by the Constitutional Debt Priority Guarantee:

> The Bonds constitute public debt, as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico (the "Constitution").  The Secretary is authorized and directed to pay the principal of and the interest on the Bonds as the same shall fall due from any funds in the Treasury of the Commonwealth available for such purpose in the fiscal year for which said payment is required.

(Section 19.)

33.    Section 20 of the 2014 GO Bond Resolution affirms that bondholders may, among other remedies, sue the Secretary of the Treasury directly to enforce the payment and constitutional priority promises:

12

In the event that the Commonwealth does not make any payment of principal of or interest on the Bonds when due in accordance with the provisions of this Resolution, a Bondholder may:

> (a) bring an action against the Secretary, in accordance with the provisions of Section 2 of Article VI of the Constitution, to compel the Secretary of the Treasury to apply available Commonwealth resources to the payment of the Bonds, as constituting public debt of the Commonwealth, in accordance with the provisions of Section 8 of Article VI of the Constitution; and

> (b) seek any other remedies that are available under applicable law or in equity to any other holder of a Commonwealth bond to which its good faith, credit and taxing power are pledged.

34.     The 2014 GO Bond Resolution also provides in Section 38 that Puerto Rico waives any available sovereign immunity defense in any "suit brought to compel the Secretary to comply with the provisions of Sections 2 and 8 of Article VI of the Constitution with respect to its obligations on the Bonds, or to enforce other remedies with respect to the Bonds provided in Section 20 of this Resolution."

35.     The 2014 GO Bond Resolution stipulates that the "Resolution shall be governed and construed in accordance with the laws of the State of New York, and the laws of the State of New York shall apply to any action or proceeding arising out of the Bonds or this Resolution." Section 37(a).  The Resolution further states that

> [t]he Commonwealth hereby irrevocably submits to the exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan, The City of New York, New York, and any Commonwealth court or U.S. federal Court sitting in San Juan, Puerto Rico, and any appellate court from any thereof (each an "applicable court")  in any action or proceeding arising out of or relating to the Bonds or this Resolution, and the Commonwealth hereby irrevocably agrees that all claims in respect of such action or proceeding . . . may be heard and determined in any such applicable court.

2014 GO Bond Resolution Section 37(b); *see also* Act No. 34-2014, § 3 (authorizing issuance of 2014 GO Bonds and waiver of sovereign immunity).

36.     The Official Statement marketing the 2014 GO Bonds states in bold on its first page:

> **The Bonds are general obligations of the Commonwealth of Puerto Rico (the "Commonwealth").   The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds.   The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.   The Constitution of Puerto Rico empowers a holder of bonds and notes evidencing public debt, including the Bonds, to bring suit against the Secretary of the Treasury to require application of available Commonwealth resources to the payment of principal of, and interest on, public debt when due.**

37.     The introductory statement to the Official Statement thus reiterates that holders of the 2014 GO Bonds would enjoy "a first claim on available public resources" and could "bring suit against the Secretary of the Treasury to require application of available Commonwealth resources to the payment of principal of and interest on public debt when due."   Indeed, the Official Statement repeatedly reaffirms the applicability of the "Constitutional priority provisions" to the 2014 GO Bonds.

38.     The Commonwealth has recognized the absolute and binding nature of the Constitutional Debt Priority Guarantee in other contexts as well.   For example, the Offering Memorandum associated with a 2006 issuance of bonds by the Puerto Rico Infrastructure Finance Authority ("PRIFA") informed purchasers of those bonds that "[t]he Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues," and made clear that funds otherwise pledged to the repayment of those bonds were subject to being applied first to the payment of debt service on the Constitutional Debt.

39.    The Constitutional Debt Priority Guarantee constitutes a material term of the Commonwealth's contracts with holders of its Constitutional Debt, and was a material inducement for purchasers of the 2014 GO Bonds, including Plaintiffs.

## II.    The Act And The Commonwealth's Repudiation Of Its Constitutional, Statutory, And Contractual Obligations

40.    On April 6, 2016, the Act was signed into law after being presented to and passed by Puerto Rico's legislature in roughly 48 hours.

41.    The Act purports to confer upon the Governor the authority to impose a moratorium on the payment of "covered obligations" of the Commonwealth and other government entities of Puerto Rico, upon the declaration of a state of emergency by executive order.  Act § 201(a).  The term "covered obligation" is defined to include Puerto Rico's Constitutional Debt.  Act § 103(l).  The Act provides that this moratorium period extends until January 31, 2017, and further provides that the period may be extended by executive order for not more than two additional months.  Act § 103(m).  Substantial principal and interest payments are due on Constitutional Debt during this moratorium period.

42.    With respect to Constitutional Debt, the Act purports to set aside the Commonwealth's constitutional, statutory, and contractual obligations to make principal and interest payments when due (or, in the case of GO-Guaranteed Debt, to guarantee the timely payment of principal and interest), and the corresponding right of the holders of Constitutional Debt to receive payment when due.  Act § 202(a)(i)(A), (C); *id.* § 103(hh).  In place of that right, the Act states that holders of public debt *may* receive—"[i]f provided for in an executive order" under the Act—a so-called "minimum public debt payment," Act § 202(a)(i)(A).  That term is then defined as follows:

> an amount determined by the Governor that is consistent with the Constitution of the Commonwealth, after consultation with the Secretary of the Treasury, which

amount may be calculated as the difference between the amount of available resources projected for the applicable emergency period and the projected expenses for essential public services during such period, applied pro rata to all holders of covered obligations that are interest obligations that constitute public debt that are due and payable (or projected to become due and payable) during the applicable emergency period (excluding any deferred or accrued amounts that will be paid on the last day of such emergency period as a result of this Act), provided that the minimum public debt payment in this clause (i) need not be paid all at once if such amount exceeds the available resources of the Commonwealth that are available to make such payment, including those subject to an executive order or applicable law that diverts such available resources towards the payment of public debt.

Act § 103(y)(i).  In other words, the Act turns the Constitutional Debt Priority Guarantee on its head, by providing that holders of Constitutional Debt will receive only whatever limited interest payments the Governor may choose to allow during the moratorium period, rather than the interest payments to which they are contractually and constitutionally entitled.

43.     Unpaid principal and interest accrue during the moratorium period, and are theoretically to be paid at the end of the period, although the Act does not specify how such payments can or will be made (or whether the legislature would authorize still further moratorium periods).  To the contrary, the Governor has spoken openly and repeatedly of his intention to attempt to restructure Constitutional Debt.  It is therefore clear that overdue principal and interest payments will not be made.  The Act is thus neither temporary nor limited; in fact, the Act effectively authorizes a complete prohibition on payment.

44.     The Act purports to confer upon the Governor discretionary authority to suspend any obligation to appropriate, transfer, or setoff revenues to pay covered obligations, or to ensure payment of a covered obligation, notwithstanding the explicit constitutional guarantees and protections for Constitutional Debt.  Act § 201(d).  In so doing, the Act purports to override the Commonwealth's longstanding statutory implementation of the Constitutional Debt Priority Guarantee, in 23 L.P.R.A § 104(c), by permitting the government to "reprioritize" expenditures

16

on "Conservation of public health," "protections of persons and property," "Public education programs," "Public welfare programs," and pension contributions above the third-priority position established by Section 104(c).

45.     The Act also purports to strip bondholders of their rights to invoke judicial remedies to enforce Puerto Rico's obligations to them.  The Act provides only that bondholders may pursue an action in the Court of First Instance of the Commonwealth seeking an order enforcing payment of the discretionary "minimum public debt payment"; it purports to *bar* bondholders from taking any other step to recover the full payments they are owed, on pain of potential liability for contempt of court and punitive damages.  Act § 201(b), (c).

46.     The Act is only the latest and most flagrant step in a broader program to repudiate the Constitutional Debt Priority Guarantee.  On June 29, 2015, Governor García Padilla delivered a television address in which he declared that Puerto Rico's debt is "unpayable" and that "Puerto Rico does not today have the capacity to continue paying under the actual terms" of its debt.  He went on to assert that bondholders must accept a "sacrifice" and that Puerto Rico should not be "force[d] to choose" between paying bondholders and competing financial priorities.  Although the Governor dutifully suggested that Puerto Rico's goal is a "negotiated" agreement with its creditors, he also stated that the result of failed negotiations will be "unilateral default" by Puerto Rico.  Thus, the Governor informed bondholders that they must "agree" to compromise their bonds or else they will not be paid.

47.     Also on June 29, 2015, Governor García Padilla issued Executive Order 2015-022 establishing a Working Group for the Economic Recovery for Puerto Rico (the "Working Group"), comprising various Commonwealth government officials.  Under the terms of the Executive Order, the Working Group is charged with developing and proposing an Economic

Recovery Plan for Puerto Rico.  The Executive Order provides that this plan "shall . . . require an adjustment of the aggregate debt load" of Puerto Rico.

48.     The Working Group issued its initial plan on September 9, 2015, and subsequently issued a revised plan in January 2016.  That document, which has served as the blueprint for Puerto Rico's plan to force creditors to accept debt restructuring, turns the Constitutional Debt Priority Guarantee on its head.  Rather than prioritizing payment on the Constitutional Debt as required by Puerto Rico's Constitution and its statutory and contractual obligations, Puerto Rico instead declared that "priority has to be given to" three large categories of expenditures: (1) "[r]eigniting Puerto Rico's economic growth," (2) "[p]roviding essential services" (or, more accurately, whatever the Commonwealth deems to be "essential services"), and (3) "[e]nsuring [that the] government can sustain its pension obligations."  In doing so, the plan openly flouts the requirement that the Constitutional Debt must be paid before Puerto Rico may spend on any other priority.  Instead, the plan first subtracts all of Puerto Rico's desired current expenditures (with only token reductions in spending) from its anticipated "available resources" and treats the residual as the amount that will be available to service the debts of Puerto Rico, the public corporations, and its instrumentalities.

49.     Plaintiffs have suffered injury as a result of the Act.  The threat that Governor García Padilla will invoke the Act to declare a moratorium on the payment of the Constitutional Debt deprives Plaintiffs of their rights and devalues their bonds.  Plaintiffs have an absolute right to be paid first among all obligations of the Commonwealth, to be paid in full, and to be paid on time.  The Act, however, purports to make those rights *discretionary* at the option of the Governor.  Puerto Rico's repudiation of its promises on the Constitutional Debt, as set forth in

the Act, has decreased the value of the bonds held by Plaintiffs. These injuries demonstrate that Plaintiffs' suit is ripe.

50. On information and belief, the Act will further harm Plaintiffs because Governor García Padilla intends to declare a moratorium on the payment of the Commonwealth's Constitutional Debt imminently. The Commonwealth owes principal and interest payments totaling approximately $800 million on its GO Bonds on July 1, 2016, and has guaranteed additional principal and interest payments of approximately $200 million on GO-Guaranteed Bonds. Given the Governor's declaration that Puerto Rico's debt is "unpayable" and the Commonwealth's decision to include its Constitutional Debt within the scope of the Act, it is virtually certain that the Governor will declare a moratorium to prevent the full July 1, 2016, payment from being made when due, and that the Commonwealth will default on this payment.

## III. The Act Is Unlawful

51. The Act purports to create legal powers that violate the United States Constitution and the Puerto Rico Constitution and exceed the legislative powers of the legislature of Puerto Rico.

### A. Count 1 – The Act Is Invalid as Applied to the 2014 GO Bonds Because the Puerto Rico Legislature Lacks Authority to Modify the Terms of New York Law

52. Plaintiffs re-allege the allegations contained in paragraphs 1 through 51.

53. The 2014 GO Bond Resolution's choice-of-law clause states that the 2014 GO Bond Resolution is governed by New York law.

54. The legislature of Puerto Rico lacks legislative authority to alter the content of New York law, including New York's substantive law of contracts and the remedies established by New York law for breach of contract. Moreover, it would violate the federal Constitution's

Due Process Clause for a territory to attempt to change the substantive law of a State, particularly having explicitly submitted to the same.

55.      The Act nonetheless purports to modify the contractual rights of holders of the 2014 GO Bonds by authorizing the Governor to declare a moratorium that would suspend the Commonwealth's obligation to make payments on the 2014 GO Bonds according to their terms, *see* Act § 201(d)(ii), and would preclude bondholders from pursuing their contractual remedies in the event of nonpayment, *see id.* § 201(b).

56.      Accordingly, the Act's provisions cannot validly be applied with respect to the 2014 GO Bonds.

**B.      Count 2 – The Act Violates Article VI of the Puerto Rico Constitution**

57.      Plaintiffs re-allege the allegations contained in paragraphs 1 through 56.

58.      Article VI, Section 8 of the Puerto Rico Constitution explicitly provides that, if Puerto Rico's "available resources" are insufficient to meet all of its desired expenditures, "***interest on the public debt and amortization thereof shall first be paid***, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. Const. Art. VI, Sec. 8 (emphasis added).  The Puerto Rico Constitution thus requires that principal and interest payments on the public debt receive the highest possible priority, and that these payments must be made before the Commonwealth may spend funds for other purposes.  Paying Constitutional Debt in full and on time is mandatory, not discretionary.

59.      The Act transgresses this absolute priority because it permits the Governor to declare a moratorium period during which principal payments on the public debt will not be paid at all, and because it provides that, rather than making contractually required interest payments, the Commonwealth will pay only the "minimum public debt payment" as defined by the Act—

and even then only if an executive order so provides.  The Act thus purports to allow the Commonwealth to spend funds for whatever purposes the Governor determines, in his discretion, before meeting its explicit, nondiscretionary constitutional obligation to pay interest to holders of its public debt.  That directly contravenes the Constitutional Debt Priority Guarantee, which requires that Constitutional Debt be paid first before all other expenditures.

60.     In addition, the Act's provision purporting to preclude bondholders from pursuing judicial remedies is incompatible with, among other provisions of law, Section 2 of Article VI of the Puerto Rico Constitution, which guarantees holders of Puerto Rico's public debt the right to bring an action to require the Secretary of the Treasury to devote any and all of Puerto Rico's available resources to the payment of the Constitutional Debt.

61.     In enacting the Act, the Puerto Rico legislature sought to justify the impairment of bondholders' contractual and property rights by invoking the Commonwealth's police power. But the restrictions on government action contained in the Puerto Rico Constitution limit the Commonwealth's exercise of its police power.  As a result, the Commonwealth lacks authority under its police power to take actions that violate the protections for holders of Constitutional Debt set forth in Article VI of the Puerto Rico Constitution.  Because the Act transgresses the Puerto Rico Constitution, it should be declared unconstitutional, and any prospective enforcement or implementation of the Act should be enjoined.

**C.     Count 3 – The Act Violates the Contract Clause of the United States Constitution**

62.     Plaintiffs re-allege the allegations contained in paragraphs 1 through 61.

63.     The Contract Clause of the United States Constitution, which applies to Puerto Rico, prohibits the Commonwealth from enacting "any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.  Under that Clause, a State may not enact a law that

21

substantially impairs a contractual relationship unless the impairment is both "reasonable and necessary to serve an important government purpose." *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25 (1977). Even if the Puerto Rico Constitution did not categorically preclude the Commonwealth from invoking its police power to impair the rights of holders of its Constitutional Debt, the Contract Clause would prevent the application of the Act to Puerto Rico's Constitutional Debt.

### 1. The Act Substantially Impairs The Commonwealth's Contractual Obligations

64. The Act substantially impairs the Commonwealth's contractual obligations to holders of its Constitutional Debt, including the 2014 GO Bonds.

65. In its contracts with holders of the 2014 GO Bonds, the Commonwealth has promised to pay principal and interest promptly when due, according to the contractually agreed terms, which are backed by explicit, nondiscretionary constitutional requirements to fulfill these duties. But the Act substantially impairs these bedrock contractual rights by purporting to authorize the Governor to declare a moratorium period during which the Commonwealth will not make substantial principal and interest payments according to its contractual commitments.

66. Through the Constitutional Debt Priority Guarantee, the Commonwealth has agreed with holders of its Constitutional Debt to make required public debt payments from all available resources before all other expenditures. But the Act substantially impairs this critical contractual right by elevating spending on whatever the Governor may deem to be "essential" or other services above payment of the Constitutional Debt.

67. Prompt payment of Puerto Rico's public debt obligations is also protected by the constitutionally guaranteed judicial remedy enshrined in Article VI, Section 2 of the Puerto Rico Constitution, which provides that the Secretary of the Treasury may be required "to apply the

available resources including surplus to the payment of interest on the public debt and the amortization thereof." But, if given effect, the Act would eviscerate that critical contract remedy by precluding any remedy other than an action in the Court of First Instance to enforce payment of the discretionary "minimum public debt payment," as defined in the Act.

> **2. The Act's Substantial Impairment Of The 2014 GO Bonds Is Unnecessary Given The Numerous Alternative Courses Of Action The Commonwealth Could Have Pursued**

68.     The Act's substantial impairment of the 2014 GO Bonds was not necessary in light of the availability of more moderate courses of action and not reasonable in light of the surrounding circumstances. Indeed, despite Puerto Rico's general protests that it cannot afford to pay its debts, it is clear that there are numerous ways in which Puerto Rico can allocate resources sufficient to respect the Constitutional Debt Priority Guarantee and make full and timely payment on its Constitutional Debt.

69.     The Commonwealth legislature's failure to consider more moderate courses of action is unsurprising given the irregular procedural circumstances under which the Act was considered and approved. As the minority leader in the Commonwealth's House of Representatives has explained, the Act reflects the Commonwealth "work[ing] under the cover of night" in a "rush and absolute improvisation." When asked whether the Commonwealth's legislators should consider the constitutionality of the Act, the President of the Commonwealth's Senate responded, "I don't think that is the job of the legislature at this time."

70.     Below we catalogue several ways in which Puerto Rico has access to more than adequate resources to recognize the Constitutional Debt Priority Guarantee. This list is not exhaustive, but it illustrates that Puerto Rico's decision to repudiate its promises to holders of its Constitutional Debt, including the 2014 GO Bonds, is unnecessary.

### a.   Respecting Creditor Priorities

71.    Most obviously, the Commonwealth could fully and promptly pay debt service on its Constitutional Debt if it would simply give effect to the clear hierarchy among its creditors. Indeed, in a restructuring proposal made public in February 2016, the Working Group itself proposed that Puerto Rico could devote approximately $1.7 billion annually to debt service.  In a revised proposal made public in April 2016, the Working Group *increased* that figure to $1.85 billion.  But the total debt service due on Puerto Rico's Constitutional Debt during Fiscal Year 2017, beginning on July 1, 2016, amounts to approximately $1.599 billion.  Thus, even crediting the Commonwealth's own view of the amounts it would like to devote to debt service, those funds are more than sufficient to pay the Constitutional Debt.

72.    In rejecting this course, the Working Group has asserted that the Commonwealth must adopt a restructuring approach that "comprehensively addresses" all debt issued by the Commonwealth and its public corporations and instrumentalities.  By this, the Working Group apparently means that the interests of all creditors—including holders of its Constitutional Debt—must be sacrificed in order to improve the Commonwealth's financial position.  But that approach is fundamentally inconsistent with Puerto Rico's obligation under the Contract Clause to pursue more moderate steps before seeking to impair the Constitutional Debt Priority Guarantee that it owes to its most senior creditors.  Because the Commonwealth could pursue precisely the same interests by impairing its lower-priority creditors, the Act's substantial impairment of the Commonwealth's contractual obligations to holders of the Constitutional Debt is unnecessary, and thus cannot be justified under the Contract Clause.

73.    In fact, the Commonwealth could divert funds previously earmarked for paying debt service on other, non-Constitutional Debt instruments to payment of the Constitutional Debt

without changing existing law.  For example, although the Commonwealth has pledged the proceeds of certain taxes and other revenues to support debt issued by the Puerto Rico Highway and Transportation Authority ("PRHTA"), PRIFA, and the Puerto Rico Convention Center District Authority ("PRCCDA"), the documents memorializing Puerto Rico's agreements with holders of these securities and the legislation authorizing the bonds expressly acknowledge that these pledged funds remain "available resources" that must first be applied to payment of the Constitutional Debt when needed.

74.     The 1998 bond resolution pursuant to which PRHTA has issued more than $3 billion of bonds expressly acknowledges that the tax revenues and license fees assigned to PRHTA for the repayment of this debt are "subject to first being applied to the payment and amortization of the public debt in accordance with the provisions of Section 8 of Article VI of the Constitution of Puerto Rico if needed therefor."

75.     Similarly, PRIFA issued Special Tax Revenue Bonds in 2005 and 2006, the service of which is primarily funded by the proceeds of certain federal excise taxes levied on rum produced in Puerto Rico and sold in the United States.  These taxes are collected by the United States Treasury and returned to Puerto Rico, which has in turn assigned the funds to PRIFA for the payment of its Special Tax Revenue Bonds.  That assignment of revenue, however, was made expressly "subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico."  3. L.P.R.A. § 1914.  Accordingly, the Official Statements that accompanied the offering of the 2005 and 2006 PRIFA bonds acknowledge that the rum-tax revenues constitute available resources under the Puerto Rico Constitution and are accordingly "subject to being applied first to the payment of debt service on the public debt of the Commonwealth."

76.     The same is true with respect to hotel occupancy tax revenues that have been assigned to the PRCCDA for payment on certain bonds issued by PRCCDA in 2006. These revenues were dedicated to PRCCDA pursuant to Act No. 272 of September 9, 2003, which includes materially identical language acknowledging that the pledge of revenue is made subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution. *See id.* at § 31(A). Thus, the Official Statement for the 2006 PRCCDA bonds acknowledges that the pledged tax revenues constitute available resources under the Puerto Rico Constitution, and provides that "they may be applied first to the payment of debt service on the public debt of the Commonwealth."

77.     In addition, petroleum tax revenues have also been assigned to PRIFA. These funds have been used to support the issuance of bond anticipation notes by PRIFA, and may be used to support an as-yet-uncompleted offering of PRIFA bonds. The legislation directing these tax revenues to PRIFA acknowledges that the funds remain "subject to the provisions of Article VI of the Constitution." Act No. 1-2015, § 2.08 (§ 3060.11A(b)).

78.     All told, Puerto Rico can divert at least $870 million *annually* from entities that the Commonwealth has expressly acknowledged are subject to claw-back of assigned revenue streams in order to meet Puerto Rico's obligations on its Constitutional Debt. This total includes approximately $172 million in petroleum tax revenues, $161 million in gasoline tax revenues, $92 million in motor vehicle license fees, $20 million in cigarette tax revenues, and $8 million in diesel oil tax revenues assigned to PRHTA; $30 million in hotel occupancy tax revenues assigned to PRCCDA; and $117 million in federal rum excise taxes and a further $270 million in petroleum tax revenues assigned to PRIFA. Standing alone, these funds that the Commonwealth

26

concedes are subject to claw-back represent approximately 54 percent of the revenues necessary to service all Constitutional Debt in fiscal year 2017.

79.     Although Governor García Padilla ordered the claw-back of certain of these pledged funds in a November 30, 2015, executive order, that order failed to require the claw-back of approximately $270 million in annual petroleum tax revenues allocated to payment of certain obligations issued by PRIFA.  Rather, consistent with the Working Group's plan, those revenues appear to have been diverted to fund operations of the Government Development Bank for Puerto Rico (the "GDB"), a financially troubled public corporation that has served as the Commonwealth's principal financing arm.  In addition, the executive order failed to require the claw-back of all eligible funds pledged to PRHTA, PRIFA, and PRCCDA.  Clawing back these additional funds was a step the Commonwealth could have taken to avoid impairing its contractual obligations to holders of its Constitutional Debt, but failed to pursue.

80.     A related issue is presented by the Puerto Rico Sales Tax Financing Corporation (known by its Spanish acronym, "COFINA"), a public corporation that, since its creation in 2006, has issued billions of dollars in debt using a structure that transparently attempts to evade the Constitutional Debt Priority Guarantee owed to holders of the Constitutional Debt.

81.     In 2006, to implement the COFINA structure, the Commonwealth purported to assign a portion of the sales and use tax revenues to COFINA, with COFINA then issuing bonds backed by those tax revenues.  The terms of the Commonwealth's agreement with COFINA do not acknowledge the Commonwealth's right and obligation to claw back earmarked revenue when necessary in order to fund payment of the Constitutional Debt.  To the contrary, the COFINA bonds disclaim any such obligation, pretending that the tax revenues assigned to COFINA are not really the Commonwealth's revenues at all.  More particularly, the portion of

27

Puerto Rico's tax receipts that is earmarked for COFINA's use is deposited into a Dedicated Sales Tax Fund (with the remainder explicitly flowing into Puerto Rico's central government general fund). 13 L.P.R.A. § 11a(c). The COFINA legislation further provides that the funds earmarked for COFINA are purportedly to be "directly deposited" in the Dedicated Sales Tax Fund, rather than the Treasury of Puerto Rico, and purports to exclude them from the Constitutional Debt Priority Guarantee by declaring that they shall not "constitute resources available to the Commonwealth of Puerto Rico." *Id.* § 12.

82.     But saying it is so does not make it so. Sales taxes imposed by the Commonwealth are a quintessential example of "available resources" for purposes of the Constitutional Debt Priority Guarantee. Their constitutional status as such cannot be eliminated by legislative proclamation; any commitments Puerto Rico has made to divert a portion of the sales taxes or other taxes to COFINA are trumped by the provisions of the Puerto Rico Constitution that created the Constitutional Debt Priority Guarantee. Just as the assignment of taxes on various tax revenues to support PRHTA's, PRIFA's, and PRCCDA's bonds must be subordinated to the Constitutional Debt Priority Guarantee, so too must the sales tax revenues—almost $700 million in fiscal year 2016—purportedly earmarked for COFINA's bondholders be available for service of the Constitutional Debt.

83.     COFINA is "attached" to the GDB (itself a separate "shadow" Treasury Department), 13 L.P.R.A. § 11a(e), and the bonds it has issued have been used to finance general government operations (including retiring debt of the Puerto Rico central government and funding ongoing operating expenses of the Puerto Rico government). COFINA serves no governmental function of its own; it literally does nothing except serve as a vehicle for Puerto

28

Rico's leaders to continue to borrow funds, in some cases with longer maturities than is permissible for Constitutional Debt.

84.     This scheme has enabled COFINA to add massive amounts of debt—more than $17 billion of the $36 billion face amount has accreted already—without any regard to the Commonwealth's constitutional requirements and limitations on debt.   The theory is that, because the bonds are issued by COFINA, the limitations set forth in Article VI of the Puerto Rico Constitution are irrelevant.   Indeed, carried to its logical conclusion, the COFINA structure would render the Puerto Rico Constitution's debt provisions meaningless:  The Commonwealth could pledge away an *unlimited* amount of tax revenue to support new borrowing by declaring through mere legislation that those revenues are not "available resources."   The Puerto Rico Constitution's carefully calibrated provisions do not permit such subterfuge.   As noted above (*see* ¶ 26, *supra*), Article VI limits the manner in which Puerto Rico's revenues can be diverted to creditors:  The Commonwealth can issue GO Bonds or can provide guarantees in support of GO-Guaranteed Bonds, both of which are subject to the 15% limit on debt service.  But Article VI does not permit the Commonwealth to pretermit this framework by simply slicing off a swath of basic tax revenue to support the issuance of new debt issued by a third-party entity.

85.     As a result, the Commonwealth's diversion of revenue in favor of COFINA is legally unenforceable.  If anything, that pledge is equivalent to so-called "appropriation debt," which may be satisfied at the Commonwealth's discretion if the Commonwealth chooses to appropriate the required funds in a given year's budget.   The Commonwealth's failure to discontinue its purported assignment of revenues to COFINA likewise represents a step the Commonwealth could have taken, but did not take, to improve its financial condition without

impairing the contractual rights of holders of its Constitutional Debt, including the 2014 GO Bonds.

### b. Implementing Needed Structural and Budgetary Reforms

86.     Standing alone, the resources that Puerto Rico itself wishes to devote to debt service are more than sufficient to pay the Constitutional Debt; all that is necessary is that the Constitutional Debt Priority Guarantee is respected. *See* ¶¶ 71-85, *supra*. But Puerto Rico also recognizes that, by adopting structural and budgetary reforms, it can generate billions more in additional resources through increased revenues and reduced expenditures. To date, however, it has refused to take the necessary steps, despite numerous opportunities to do so.

87.     As a general matter, Puerto Rico has failed to adequately rein in its spending. Even under the Working Group's plan, the government's general fund budget will continue to rise, from $7.963 billion in Fiscal Year 2016 to $9.193 billion in Fiscal Year 2020 (all figures excluding debt service). As explained below, this is due in no small part to the Working Group's rejection of serious fiscal and budgetary reforms that would save significant amounts of money over the next five years, including a failure to generate significant additional tax revenue. Indeed, Governor García Padilla praised the plan for *not* seeking to impose "additional taxes besides those that have already been adopted in the last decade."

88.     Puerto Rico has also demonstrated poor performance in collecting existing taxes. For example, compliance with Puerto Rico's sales tax has been estimated at just 56 percent. This is true in part because a large share of Puerto Rico's economy—up to 23 percent of gross domestic product—takes place in an underground economy that escapes taxation altogether.

89.     Puerto Rico likewise has failed to maintain its tax base and has taken only limited steps to bring overall tax burdens to an appropriate level. A study performed by the international

accounting firm KPMG on behalf of the Puerto Rico Treasury Department concluded that Puerto Rico collects approximately 10.6% of its gross domestic product in income and consumption taxes—a figure that was exceedingly low in comparison to the countries KPMG selected as peer jurisdictions.

90.     Moreover, Puerto Rico's real estate property taxes—which are earmarked in part to fund payments on the GO Bonds—are still based on valuations conducted in 1958.  Because Puerto Rico has failed to adjust the property tax base to account for increases in property values (or even basic inflation), and because property tax rates have stayed generally constant since 1991, property tax receipts have languished.

91.     The need and potential for significant reforms is widely recognized.  Last year, the GDB retained (through its legal counsel) former IMF economists Anne Krueger, Ranjit Teja, and Andrew Wolfe as consultants to analyze Puerto Rico's economic condition.  They prepared a report (the "Krueger Report"), which was released on June 29, 2015, in conjunction with Governor García Padilla's announcement of Puerto Rico's restructuring program.  In addition to identifying a temporary and declining funding gap for Puerto Rico over the next several years, to be followed by fiscal surpluses, the Krueger Report also identified numerous budgetary and structural reforms that Puerto Rico could undertake to improve its conditions.

92.     Although the Krueger Report is itself flawed in important respects, even taken at face value it confirms that Puerto Rico has significant opportunities to engage in meaningful reforms that would further disprove any conceivable need to impair its Constitutional Debt (even if impairment were legally permissible).  For example, the Krueger Report notes the potential for substantial savings in the educational sector in light of significant decreases in student enrolment, and predicts that reforms could save up to $400 million annually within five years.

93.     Likewise, the Krueger Report recommends a reduction in the lavish subsidies provided to the University of Puerto Rico ("UPR"), which exceed $800 million annually. According to the Krueger Report, students at UPR "currently pay a low flat rate that for many is far lower than on the mainland" and, indeed, "is far lower than what well-off UPR students paid for private high school."  The Krueger Reports therefore recommends that this blanket subsidy be replaced with a program of need-based scholarships, and estimates that this reform would save approximately $500 million annually within five years.

94.     The Krueger Report recognizes the opportunity to yield an improvement of almost $6 billion in Puerto Rico's annual finances by Fiscal Year 2020, through a combination of revenue-increasing measures, expenditure reductions, and reform-induced economic growth. Tellingly, however, the Working Group's plan fails to adopt a number of the Krueger Report's proposals—rejecting some wholesale, and proposing only token gestures in the direction of others.  For example, whereas the Krueger Report suggested revisions to Puerto Rico's antiquated property tax regime that would raise approximately $1.35 billion over the next five years, the Working Group has rejected this reform (instead noting—entirely speculatively—that municipalities *may* propose property-tax modernizations).  Likewise, in place of the Krueger Report's suggestion to reduce subsidies to the University of Puerto Rico by $1.4 billion over the next five years, the Working Group contemplates just $500 million of cumulative savings (and trivial reductions in the near term).  All told, the Working Group's plan proposes approximately $4.4 billion less in combined revenue enhancements and spending reductions than was proposed in the Krueger Report for the next five years.

95.     More recent developments also make clear that the Commonwealth has not made serious efforts to implement budgetary reforms.  To the contrary, the Commonwealth has taken steps in precisely the opposite direction.

96.     For example, on May 26, 2016, the Puerto Rico legislature repealed a planned increase in the Commonwealth "business-to-business" tax, which the Commonwealth's government has projected will result in a loss of approximately $50 million in annual tax collections.  The same legislation also derails the Commonwealth's planned transition from its current sales and use tax to a value-added tax, which had been intended to improve tax collection rates.

97.     On the expenditure side, Governor García Padilla's recent budgetary proposals also demonstrate the Commonwealth's lack of commitment to conserving financial resources. The Governor's proposed budget for Fiscal Year 2017 includes $9.1 billion in spending from the Commonwealth's general fund.  Although that amount nominally represents a reduction in spending from the prior year, that is so only because the proposed budget—in violation of Article VI of the Puerto Rico Constitution—contemplates funding only $322 million of the approximately $1.178 billion that is necessary to fully fund debt service on the GO Bonds in Fiscal Year 2017.  Exclusive of debt service, the proposed budget in fact includes more than $600 million in *increased* expenditures.  The budget also proposes an increase in government employment of 816 positions for Fiscal Year 2017.  That is, even as the Commonwealth claims it cannot afford to pay its Constitutional Debt, it is increasing spending and increasing public employment.

98.     In summary, the Constitutional Debt Priority Guarantee requires that Puerto Rico's obligations on its Constitutional Debt come first, prior to all other expenditures.  During

Fiscal Year 2017, debt service on the Constitutional Debt amounts to approximately $1.599 billion, and Puerto Rico has projected general fund revenues of $9.1 billion (to say nothing of the $870 million in revenue that is expressly subject to claw-back, the over $700 million in sales tax revenues pledged to COFINA, and the billions of dollars in additional revenue-increasing measures and expenditure reductions the GDB's advisors have recommended.  The availability of these revenue sources makes clear that the Commonwealth is able to address its financial difficulties without impairing the contractual rights of holders of the Constitutional Debt, who are the Commonwealth's most senior creditors.

> ### 3. The Act's Impairment of the 2014 GO Bonds is Unreasonable Because It Advances the Interests of Certain Creditors and Stakeholders at the Expense of Plaintiffs and Other Holders of Constitutional Debt

99.     The Act is also unreasonable because it prioritizes the interests of the Commonwealth and certain of its creditors and stakeholders, at the expense of Plaintiffs and other holders of the Constitutional Debt.

100.     In particular, the Act protects special interests and groups rather than the public as a whole by targeting Puerto Rico's financial debt for impairment.  Absent special designation of other obligations by the Governor (see Act § 103(l)(r); id. § 201(a)), the Act's terms—including its stay on creditor litigation and the abrogation of the obligation to make timely payment when due—apply only to principal and interest obligations on financial debt.  The effect of the Act is to place the consequences of Puerto Rico's financial mismanagement on Plaintiffs and other holders of the Constitutional Debt, without sharing the burden with other creditors and stakeholders—such as trade creditors and those who receive subsidies or other payments from the Puerto Rico government.

101.    Moreover, the discretion conferred on Governor García Padilla to declare states of emergency and initiate moratoriums as he sees fit virtually ensures that the Act will be used to further parochial interests, at the expense of holders of the Constitutional Debt.

102.    For example, upon information and belief, on May 31, 2016 the Commonwealth repaid $200 million in Tax Revenue Anticipation Notes ("TRANs"), short-term loans that are not backed by the Commonwealth's good faith, credit, and taxing power and hence do not constitute Constitutional Debt.    These funds were borrowed from several of Puerto Rico's public corporations in August 2015.    Moreover, upon information and belief, the Commonwealth intends to make a further payment of $200 million in repayment of this TRANs offering on June 30, 2016.  Thus, even as the Commonwealth prepares to default on its constitutionally secured obligations to holders of its Constitutional Debt, it will spend $400 million to repay lower priority obligations owed to stakeholders who happen to be favored by the Commonwealth's officials.

### 4.    The Act Cannot Be Defended as an Emergency Measure

103.    The Act's application to holders of the Constitutional Debt, including the 2014 GO Bonds, cannot be defended as an emergency measure, primarily because (as discussed above) there is no emergency preventing Puerto Rico from meeting its obligations to holders of the Constitutional Debt, including the 2014 GO Bonds.  If Puerto Rico would simply respect the existing hierarchy of priorities among its creditors, it would have—by its own admission—more than sufficient resources to service the Constitutional Debt.

104.    Moreover, although the Act purports to authorize a moratorium of only a limited duration, as a practical matter there is no reasonable prospect that the Act will constitute only a temporary impairment of the contractual rights of holders of the Constitutional Debt, including the 2014 GO Bonds.  As noted above, far from taking steps to improve its financial condition,

35

the Commonwealth is moving in the opposite direction.  The Commonwealth's evident plan is to attempt to force holders of Constitutional Debt to accept *permanent* impairment of their absolute right to receive payment, through the imposition of a purportedly temporary moratorium.

105.    Given all these circumstances—and particularly in light of the strong reliance interests at issue here in light of the constitutionally enshrined priority of Puerto Rico's Constitutional Debt—the Act substantially, unreasonably, and unnecessarily impairs the obligation of contracts, and accordingly violates the Contract Clause of the United States Constitution.

**D.     Count 4 – The Act Violates the Contract Clause of the Puerto Rico Constitution**

106.    Plaintiffs re-allege the allegations contained in paragraphs 1 through 105.

107.    For the reasons set forth above, Defendants' conduct also violates the parallel Contract Clause in Article II, Section 7 of the Puerto Rico Constitution, which provides that "[n]o law impairing the obligation of contracts shall be enacted."  That provision is analogous to the Contract Clause of the United States Constitution and provides at least the same level of protections against impairments of the obligation of contracts.  See, *e.g.*, *Bayrón Toro v. Serra*, 19 P.R. Offic. Trans. 646, 661-62 (P.R. 1987); *Warner Lambert Co. v. Superior Court of Puerto Rico*, 1 P.R. Offic. Trans. 527, 550-53 (P.R. 1973).

**E.     Count 5 – The Act Violates the Takings and Due Process Clauses of the United States Constitution**

108.    Plaintiffs re-allege the allegations contained in paragraphs 1 through 107.

109.    The Fifth Amendment to the U.S. Constitution, which applies to Puerto Rico, provides that private property shall not be "taken for public use, without just compensation." The Fifth and Fourteenth Amendments to the U.S. Constitution further prohibit the "depriv[ation] of life, liberty, or property without due process of law."

110.    Plaintiffs' ownership of 2014 GO Bonds carries certain vested contractual and property rights, including but not limited to the Constitutional Debt Priority Guarantee.

111.    As holders of 2014 GO Bonds, Plaintiffs had reasonable investment-backed expectations that their contractual and property rights as bondholders, including the Constitutional Debt Priority Guarantee, would be preserved.  These rights were substantial and material features of the Constitutional Debt.

112.    Plaintiffs' contractual and property interests in the 2014 GO Bonds and the Constitutional Debt Priority Guarantee are constitutionally cognizable property rights protected by the Fifth and Fourteenth Amendments to the U.S. Constitution.

113.    The Act takes Plaintiffs' contract and property rights embodied in the Constitutional Debt Priority Guarantee, by authorizing the Commonwealth to (a) nullify the Commonwealth's obligation to pay interest and principal promptly when due; (b) prioritize other expenditures above payment of the Constitutional Debt; and (c) deprive Plaintiffs of their contractually and constitutionally guaranteed remedies to enforce payment on the Constitutional Debt without due process of law.

114.    Puerto Rico's taking of this property without just compensation was unlawful and Plaintiffs are therefore entitled to all appropriate remedies for that violation.

**F.    Count 6 – The Act Violates the Takings and Due Process Clauses of the Puerto Rico Constitution**

115.    Plaintiffs re-allege the allegations contained in paragraphs 1 through 114.

116.    For the reasons set forth above, Defendants' conduct also violates the parallel Takings Clause in Article II, Section 9 of the Puerto Rico Constitution, which provides that "[p]rivate property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law."  That provision is analogous to the Takings

37

Clause of the United States Constitution and provides at least the same level of protections against takings of private property without just compensation.  Defendants' conduct likewise violates the parallel Due Process Clause in Article II, Section 7 of the Puerto Rico Constitution, which provides that "[t]he right to life, liberty, and the enjoyment of property is recognized as a fundamental right of man. . . .  No person shall be deprived of his liberty or property without due process of law."  That provision is analogous to the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution and provides at least the same level of protections.

G.      **Count 7 – The Act Unconstitutionally Denies Litigants Access to the Courts**

117.    Plaintiffs re-allege the allegations contained in paragraphs 1 through 116.

118.    Section 201(b) and (c) of the Act purport to preclude bondholders of covered obligations from pursuing judicial remedies in connection with any covered obligation.  Indeed, by purporting to bar bondholders from commencing any proceeding that could result in "any order" or "judgment" "related to any covered obligation," the Commonwealth may seek to preclude challenges to the constitutionality of the Act itself.

119.    The Commonwealth may not, however, enjoin proceedings in federal court.  *See*, *e.g.*, *Donovan v. City of Dallas*, 377 U.S. 408, 411-13 (1964).  To the extent any provision of the Act enjoins, stays, suspends, or precludes Plaintiffs from exercising their rights in federal court, including the right to challenge the constitutionality of the Act itself in federal court, those provisions also violate the United States Constitution.

H.      **Count 8 – Enforcement of the Act Violates 42 U.S.C. § 1983**

120.    Plaintiffs re-allege the allegations contained in paragraphs 1 through 119.

121.    As stated above, the Act deprives Plaintiffs of rights, privileges, and immunities secured by the Constitution and laws of the United States, including rights under the Contract

38

Clause and Takings Clause, and the constitutional right of access to the courts.  The Act does so under color of law of the territory of Puerto Rico.  Accordingly, the Act violates 42 U.S.C. § 1983.

## PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF

122.    Plaintiffs re-allege the allegations contained in paragraphs 1 through 121.

123.    The Act improperly impairs the rights of the Plaintiffs under the 2014 GO Bonds in conflict with the United States Constitution, the Puerto Rico Constitution, and the laws of the State of New York.

124.    If the Act is invoked to impose a moratorium on payment of the 2014 GO Bonds, the defendants would further these violations of United States Constitution, the Puerto Rico Constitution, and the laws of the State of New York.

125.    To the extent the Act purports authorize the Governor to enjoin, stay, suspend, or preclude bondholders from exercising their rights in federal court, the Act violates Plaintiffs' constitutional right of access to federal court.

126.    Plaintiffs are entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 that the Act cannot be validly applied with respect to the 2014 GO Bonds and an injunction prohibiting the Act from being enforced with respect to the 2014 GO Bonds.

127.    Plaintiffs therefore respectfully pray for a judgment:

   a. declaring that the Commonwealth is obliged to afford its public debt absolute payment priority over all other expenditures, and that the Act cannot be validly applied and is unenforceable with respect to the 2014 GO Bonds because it violates the United States Constitution and the Puerto Rico

Constitution, and exceeds the scope of the Puerto Rico legislature's legislative authority;

b.  enjoining any enforcement or implementation of the Act as applied to the 2014 GO Bonds;

c.  awarding costs, including attorneys' fees; and

d.  granting such other and further relief as the Court deems just and proper.

June 21, 2016                                    Respectfully submitted,

                                        /s Ariel N. Lavinbuk
                                        Mark T. Stancil (*pro hac vice* forthcoming)
                                        Gary A. Orseck (*pro hac vice* forthcoming)
                                        Ariel N. Lavinbuk (S.D.N.Y. Bar. No.
                                            AL7008)
                                        Donald Burke (*pro hac vice* forthcoming)
                                        ROBBINS, RUSSELL, ENGLERT, ORSECK
                                            UNTEREINER & SAUBER LLP
                                        1801 K Street, NW
                                        Washington, D.C. 20006
                                        (202) 775-4500
                                        mstancil@robbinsrussell.com
                                        gorseck@robbinsrussell.com
                                        alavinbuk@robbinsrussell.com
                                        dburke@robbinsrussell.com

                                        *Counsel for Plaintiffs*

40