# Exhibit A

Parte II – English Version of the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act

## A. Introduction

The fiscal situation of the Government of Puerto Rico is more dire than at any other point in its history. Notwithstanding bold, unprecedented and comprehensive efforts that this Administration has put in place during the last three years to return the Commonwealth of Puerto Rico ("Commonwealth") to a path of economic recovery and fiscal sustainability, the lack of access to the capital markets, high levels of indebtedness and relentless economic headwinds have brought the Government of Puerto Rico's fiscal crisis to a perilous tipping point. This Administration has endeavored to marshal the means to meet debt service payments on its General Obligation bonds (as well as the obligations of other Commonwealth instrumentalities), while providing essential services. However, depleted resources and strained liquidity threaten to bind the Commonwealth to a choice between honoring its commitments to bondholders or continuing to provide the residents of Puerto Rico with essential services.

All governments are morally and legally indebted, first and foremost, to the people they serve and to whom they are accountable. The Commonwealth's obligation to the well-being of its people thus, necessarily, takes precedence over all others. Substantial payment obligations of the Commonwealth and the Government Development Bank for Puerto Rico ("GDB") will come due in the following months, as has been made public before. In light of this juncture, in which the Government of Puerto Rico does not have sufficient resources to comply with debt service obligations as originally scheduled and, additionally, to continue providing essential services to the people, the Commonwealth needs tools to exercise its police powers in order to protect the health, safety and welfare of the people of Puerto Rico.

## B. Fiscal Reform Efforts

The priority of this Administration has been to address Puerto Rico's fiscal and economic crisis. From inauguration day, this Administration has taken robust measures to correct decades-old problems that had been draining the Commonwealth's finances, to phase out deeply flawed historical fiscal practices, and to secure the necessary financing needs for Puerto Rico's fiscal sustainability. These efforts have been undertaken hand-in-hand with the management of GDB, the Commonwealth's fiscal agent, depositor, and historically, its lender of last resort, which has also adamantly endeavored to manage its own liquidity constraints.

In March of 2014, the Commonwealth issued $3.5 billion in General Obligation bonds due to a pressing need to secure financing. The proceeds of this issuance would provide the Commonwealth with financing as much-needed structural efforts at fiscal reform took place. Well aware that, in order to achieve a sustainable, long-term solution to the Government of Puerto Rico's financial problems, we had to abandon the recurring practice of deficit financing, the proceeds of this issuance were nonetheless used to pay several outstanding obligations and to provide financing while the Administration implemented several fiscal reform measures, and while a number of other structural changes already in place generated results.

Likewise, in order to bolster central government revenues, this government passed Act 72-2015, which increased the Sales and Use Tax from 7% to 11.5%. Additionally on the

revenue side, and in order to tackle one of the more pressing issues facing GDB, Act 1-2015 increased the crude oil excise tax. The new revenues were assigned to the Puerto Rico Infrastructure Financing Authority ("PRIFA"), allowing it market access, and the proceeds were pledged to a future bond issuance towards the payment of the Puerto Rico Highways and Transportation Authority's ("HTA") outstanding debt of $2.2 billion held by GDB, for which there was no payment source. HTA's indebtedness to GDB originated as a result of the unsound past practice – particularly from 2009 to 2012 – of GDB providing financing to the Commonwealth's instrumentalities without securing a clear and dependable source of repayment.

Additionally, the repeal of Section 936 led to a significant loss of a key funding source for GDB since depositaries of Section 936-funds were required to keep a certain percentage of their Section 936 deposits in GDB. The completion of the 10-year phase out period of Section 936 led to a profound transformation in GDB's funding structure. It likewise led to the loss of thousands of manufacturing jobs with catastrophic effects to the Commonwealth's economy. Consequently, GDB was forced to turn to other sources of funds in order to continue providing financing to the Commonwealth and its instrumentalities. Throughout the second-half of the Section 936 phase-out period (2001-2006), GDB relied on a robust commercial paper program as a key source of financing, enabled by the Commonwealth's and GDB's excellent credit rating. As the Commonwealth and, subsequently the GDB, began experiencing the first credit rating downgrades between 2004 and 2006, the viability of the Bank's commercial paper program was put in jeopardy, hence leaving the Bank, once again, without a key source of funding to continue acting as financing agent of the Commonwealth. Therefore, in 2006, GDB issued its first series of notes, which then increased dramatically thereafter from 2009 to 2012. The administration in office during that four-year period brought GDB's outstanding debt to $5.6 billion by June 30, 2012. To make matters worse, GDB's balance sheet was severely compromised during that period, since GDB made a series of long-term loans – including some with maturities over 20 years -- while the notes issued during the same period had short-term bullet maturities of between 5 and 15 years. In other words, between 2009 and 2012, GDB incurred a series of medium-term debt obligations but set the receipt of income on its loans to long-term maturities, therefore creating a dramatic imbalance between its assets and liabilities.

Notwithstanding the Legislative Assembly's approval of the measure, and PRIFA's and GDB's attempt to place an issuance of PRIFA bonds, by that time market uncertainty and Moody's Investor Service's downgrading of several of the Commonwealth's outstanding credits had dramatically increased the risk premium on the issuance of PRIFA bonds, and led potential investors to require burdensome and unreasonable concessions as a condition to participate in the deal. Consequently, notwithstanding the fact that the repayment of HTA's debt would have dramatically strengthened GDB's balance sheet and liquidity, market conditions were simply not favorable, and the Commonwealth made the responsible decision to forego what would have been an extremely onerous transaction.

In addition to these and other revenue measures already put in place, through Acts 3-2013 and 160-2013, and an attempt to access the capital markets, this Administration has also begun to implement comprehensive structural reforms to address and stabilize the historic actuarial deficits of Puerto Rico's public employee and teacher's pension systems, respectively. This Legislative Assembly also enacted the Puerto Rico Special Fiscal and Operational Sustainability Act – Act 66-2014 – which introduced profound cuts in central government and public

corporation expenditures, and resulted in hundreds of millions of dollars in savings for the Commonwealth without resorting to laying off public employees. Shortly thereafter, and wary of the effect that the debt load of the Commonwealth's public corporations would have on the central government, and on the Government of Puerto Rico's ability to provide essential services, this Legislative Assembly enacted Act 71-2014, the Puerto Rico Public Corporation Debt Enforcement and Recovery Act. Act 71-2014, known as the "Recovery Act," provides a legal framework for restructuring the debts of our public corporations – with due regard to the rights of creditors – while also ensuring that vital public services, such as clean water and electricity, are not interrupted due to debilitating debt loads.

### C. The Krueger Report, the Fiscal and Economic Growth Plan, and Debt Restructuring Efforts

Having made the responsible decision to cease the flawed and unsustainable practice of deficit financing, the Commonwealth commissioned former World Bank Chief Economist and former deputy director of the International Monetary Fund, Dr. Anne Krueger, to conduct a comprehensive study of Puerto Rico's fiscal and economic outlook. Dr. Krueger and her team of renowned economists produced their report, *Puerto Rico: A Way Forward* (the "Krueger Report"), which laid bare the extent of the Commonwealth's fiscal and economic problems, and traced a path to recovery.

The Krueger Report arrived at a number of fundamental conclusions. First, it concluded that Puerto Rico's fiscal and economic problems are structural in nature, and can thus only be meaningfully addressed by further comprehensive structural reforms. Second, it concluded that the Government of Puerto Rico had historically underestimated General Fund deficits by leaving out capital expenditures as well as the deficits of other government component units that are regularly and ultimately financed by the central government. Accordingly, the true General Fund deficit was in fact much greater than had been estimated before. Third, and most importantly, the Krueger Report concluded that the Commonwealth's debt load is unsustainable without significant economic growth.

Based in part on the findings and recommendations of the Krueger Report, on June 29, 2015 Governor García Padilla publicly declared that the Commonwealth's debt is unpayable, and that our Administration would seek to restructure the Commonwealth's debt by way of a voluntary exchange process with our creditors. Accordingly, shortly thereafter, Governor García Padilla issued Executive Order OE–2015-022, creating the Working Group for the Fiscal and Economic Recovery of Puerto Rico (the "Working Group"), and ordered the drafting of the Puerto Rico Fiscal and Economic Growth Plan (the "Plan"), which would outline the structural measures needed for Puerto Rico to return to a path of economic growth and fiscal sustainability.

Thereafter, the Working Group published the Plan on September 9, 2015. The Plan set forth a comprehensive program with fiscal and economic measures designed to ignite growth, implement sound fiscal policy throughout the Commonwealth, and restore financial credibility to Puerto Rico. Also, as an important negotiation tool, it provides our creditors with assurances that the Commonwealth will be able to meet its debt service commitments in the future.

Implementation of many of the measures in the Plan has begun and are projected to bear fruit in the future. Likewise, discussions with our creditors are also well underway, proposals toward restructuring the Commonwealth's debt have been presented, and negotiations are active and ongoing.

### D. Extraordinary and Emergency Financial Management Measures

Throughout the last three years, the Commonwealth has implemented several additional extraordinary liquidity preservation and cash management measures with the aim of preserving the government's ability to render essential services, while allowing time for both the fiscal reforms already implemented and the Plan measures to take effect, and also time for negotiations with our creditors to bear fruit. These extraordinary measures include the following: (1) the Commonwealth received short-term financing from Tax and Revenue Anticipation Notes issued by three public corporations; (2) the Commonwealth received special dividends from public sector entities; (3) the Department of the Treasury required the public employees' and teachers' retirement systems to advance the amounts due to pensioners, as opposed to the traditional payment mechanism whereby Treasury would advance pension payments and have the retirement systems reimburse the central government at a later date; (4) set asides for the payment of general obligation bonds were suspended during fiscal year 2016; (5) payments due to private sector providers were delayed; (6) the disbursement of certain budgetary appropriations was delayed; and (7) tax refunds owed to citizens were delayed, to mention a few.

Furthermore, and notable amongst the extraordinary measures employed by the Commonwealth, the Governor issued Executive Order OE-2015-046 on November 30, 2015, pursuant to Section 8, Article VI of the Commonwealth's Constitution. This order redirected revenue streams pledged to the payment of debts of PRIFA, HTA, the Puerto Rico Convention Center District Authority, and the Metropolitan Bus Authority which are "available resources" for purposes of Section 8, Article VI, towards the payment of general obligation debt.

Concurrently, GDB has taken its own set of extraordinary cash management measures in order to preserve and maximize liquidity for the central government, and to preserve its own functions and meet its own obligations. Nonetheless, the measures employed by both GDB and the Commonwealth are temporary, one-off and extraordinary in nature, and not sustainable in the long term, and their effects are quickly waning.

### E. Need for a Moratorium

Restructuring negotiations are ongoing with our creditors. GDB has also engaged its own noteholders over the possibility of reaching an agreement in the near future. We are hopeful that an agreement will be reached that will bring the Commonwealth's debt service within reasonable and sustainable bounds, and with due regard to the rights of our creditors.

We are also actively engaged in litigation over the constitutionality of the Recovery Act before the United States Supreme Court. The case has been argued and submitted, and we are confident the Court will find our arguments persuasive, that the Recovery Act is within the limits of the U.S. Constitution, and that Congress could not have intended to strip Puerto Rico of the benefits of Chapter 9 of the U.S. Bankruptcy Code, while also prohibiting Puerto Rico from passing the Recovery Act pursuant to its police powers to keep and maintain its fiscal house in order, and to preserve its ability to continue providing essential services to the people.

We are also actively engaged in the federal political process, working together closely with our allies in the U.S. Congress and the White House in the hopes that the U.S. government will provide Puerto Rico with a debt restructuring mechanism by way of federal legislation. A number of draft bills have been proposed, and though our creditors are lobbying for their own interests, we are hopeful that Congress will address our debt crisis in a fair and equitable manner.

Notwithstanding progress on many fronts, Puerto Rico is in need of immediate relief. The Commonwealth and GDB face formidable debt-service obligations in the very near future.  On May 1, 2016, GDB is due to make a principal payment of $400 million on GDB notes, but as of April 1, 2016, GDB's liquidity nevertheless stood at only $562 million.  More importantly, the Commonwealth faces its own debt service payment on its general obligation debt of $780 million shortly thereafter on July 1, 2016.  Neither the Government of Puerto Rico nor GDB may have sufficient resources to make their respective payments without potentially jeopardizing the Commonwealth's ability to provide essential services.  The wages of police officers, firemen and other emergency management workers, the funds needed to operate our public health facilities and to provide our schoolchildren with meals during the school day, and our public utilities' ability to provide power and water, all hang in the balance.

The time has come for this Legislative Assembly to act to protect the safety and welfare of the people of Puerto Rico, and empower the executive to declare a moratorium on the government's debts, should the Governor deem it a necessary exercise of this Government's police powers.

### F. The Commonwealth's Police Powers and Legal Basis for a Moratorium

The Commonwealth's police powers derive directly from Article II, Section 19 of the Constitution of the Commonwealth of Puerto Rico, which states that "[t]he power of the Legislative Assembly to enact laws for the protection of the life, health, and general welfare of the people shall likewise not be construed restrictively."  Thus, the Commonwealth wields inherent and broad powers to legislate for the protection of the general welfare of its citizens. Domínguez Castro v. E.L.A., 178 D.P.R. 1 (2010).  Amongst the inherent powers of a sovereign to legislate for the general welfare of its citizens lies the power to suspend payments and extend due dates and maturities on the obligations of the state and its instrumentalities, in order to address a fiscal or financial crisis or avert a humanitarian disaster.  Ropico, Inc. v. City of New York, 425 F. Supp. 970 (S.D.N.Y. 1976).

Accordingly, pursuant to the Commonwealth's police powers, we the Legislative Assembly of the Commonwealth of Puerto Rico have resolved to provide the Governor with powers to declare a state of emergency for the Commonwealth and its instrumentalities, including GDB, and declare a moratorium on the payment of certain obligations of those entities.  Known as the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act (the "Act"), it empowers the Governor with narrowly tailored authority, within the bounds of our body of laws and our Constitution, to enable the Commonwealth and its instrumentalities to continue providing essential services to Puerto Rico's residents while addressing the critical need for structural and fiscal reform and debt restructuring.

The measures prescribed herein are narrowly tailored to meet the paramount public purpose of securing the health, safety and welfare of the people of Puerto Rico and averting the further deterioration of the humanitarian crisis in Puerto Rico, and are the least burdensome of alternatives to accomplish this purpose.  The Act provides for moratorium measures that are temporary in nature and only apply upon a finding by the Governor that invoking the provisions of the Act is necessary to provide for the health, safety and welfare of the residents of the Commonwealth. Further, such measures (including the stay on creditor actions) are invoked on an entity-by-entity basis and, without a specification by the Governor of further enumerated

obligations, only affect limited financial indebtedness obligations coming due during a temporary period.

In addition, the measures set forth in the Act are crafted with due regard to the rights of Puerto Rico's creditors. The Act does not provide for a composition or discharge of debts; instead, all claims and priorities are preserved, and any unpaid amounts on the obligations of the Commonwealth and its instrumentalities are not forgiven and instead are payable, as set forth in the Act, at the end of any moratorium period to the extent permitted by otherwise applicable law. Further, the Act respects Constitutional priorities by establishing minimum criteria for the payment of the Commonwealth's public debt that may come due during the temporary moratorium period. The Act also provides for the recognition of bona fides property rights and allows creditors access to adequate protection or, in the event of an expropriation, a mechanism to seek just compensation and redress. This Legislative Assembly further recognizes that the measures set forth in this Act, by affording the Commonwealth the ability to stabilize and grow the Puerto Rican economy while avoiding a morass of litigation, represent the best chance for the Commonwealth's creditors to recover their investments. Accordingly, the Act seeks only to empower the Commonwealth to delay payment on certain obligations while protecting creditor rights, and serves its utmost duty to protect the citizens of Puerto Rico.

Additionally, beyond providing for a moratorium alone, and as described in the summary below, the Act addresses GDB's critical situation by modernizing the receivership provisions of its organic act and providing for the authorization to create a bridge bank for GDB, in order to preserve liquidity and valuable assets for the benefit of the Commonwealth and to ease the transition of GDB into a more modern entity. Finally, the Act provides for the creation of an authority specifically designed to take charge of the Commonwealth's restructuring efforts.

This Act is the culmination of years of attempts by this Administration to forestall an economic and humanitarian catastrophe; while such attempts have contributed meaningfully to improving the fiscal position of the Commonwealth, it has become evident to this Legislative Assembly that such measures are no longer sufficient. At the same time, the Commonwealth and its instrumentalities, including GDB, face looming debt service payments in the immediate future, payments that Puerto Rico will not be able to make while still providing for essential services. As a consequence, Puerto Rico stands at the precipice of a disastrous phase of disorderly payment defaults, multiple litigations, and further economic decline as our dwindling resources are devoted to litigation defense instead of paying for essential public services. It is therefore of utmost importance to provide the government with the legal framework to weather this extremely difficult period, and this Act establishes a comprehensive framework of measures that this Legislative Assembly deems reasonable, necessary and narrowly tailored in light of the fiscal and humanitarian emergency that Puerto Rico faces.

### G.    Summary of the Act

The Act's has four primary objectives. The first objective is contained in Chapter 2 of the Act, which authorizes the Governor to (i) declare—at some point in the future—a moratorium on debt service payments for a temporary period for the Commonwealth, GDB, the Economic Development Bank for Puerto Rico ("EDB"), or any of the remaining government instrumentalities of Puerto Rico, and (ii) stay creditor remedies that may result from the moratorium. The second objective is contained in Chapters 3 and 4 of the Act, which amend GDB's Enabling Act to give GDB options and tools that it may need—at some point in the

future—to address its own resolution. These amendments (a) modernize GDB's Organic Act related to a receivership for GDB, and (b) authorize the creation of a temporary "bridge" bank to carry on certain of GDB's functions and honor deposits. The third objective is contained in Chapter 5 of the Act, which amends the Enabling Act of the EDB to modernize its receivership provisions. The fourth objective is contained in Chapter 6 to create a new fiscal agency and financial authority.

### Summary of Chapter 1 of the Act

Chapter 1 of the Act establishes the general provisions of the law. These provisions include those related to a declaration of a state of emergency, key definitions, and authorization for certain governmental units to hire employees. Chapter 1 also establishes immunities for persons acting in furtherance of this Act by providing that no person (including any person, director, officer, employee, contractor, agent, or representatives) shall have any liability for actions taken, or not taken, in good faith in furtherance of this Act.

### Summary of Chapter 2 of the Act

Chapter 2 authorizes the Governor to declare a moratorium and stay creditor remedies with respect to obligations of the government entities covered by the moratorium. It also provides conditions on the government's use of a moratorium and provides protections for creditors, such as preserving security interests and collateral used to secure various obligations.

The provisions of the Act authorizing the Governor to declare a moratorium go into effect immediately upon its enactment, and they generally expire on January 31, 2017. The period during which a moratorium may be declared is defined as the "covered period," and it is subject to a two-month extension by the Governor. The moratorium provisions classify the various Puerto Rico entities (including the Commonwealth itself) into the following two categories because the Act treats the creditors thereof slightly differently: (i) the "Bank," which is defined as GDB and/or the EDB, and (ii) "government entities," which includes the Commonwealth itself and the remaining government entities and public corporations with significant indebtedness in Puerto Rico (regardless of whether they are covered by the Fiscal and Economic Growth Plan issued by the Working Group of the Fiscal and Economic Recovery of Puerto Rico).

The Governor has the power to declare, by executive order, which order may be terminated by the Governor, an emergency with respect to the Bank and/or any government entity during the covered period. The period after such a declaration has been made is known as, with respect to such Bank or government entity, the "emergency period," and the emergency period for all entities ends on the last day of the covered period. The Governor's declaration of an emergency can render the debt service obligations of the Bank or such government entity, as applicable, as "covered obligations." The Governor's declaration can also identify additional obligations specifically or by category—such as obligations related to derivatives—to be "covered obligations." If so provided in an executive order, payments on covered obligations may not be made during the emergency period, and covered obligations will be due on the last day of the covered period to the extent they are otherwise due before or during the covered period.

During the emergency period *for the Bank*, legal actions in respect of covered obligations are stayed, and at any time during the covered period, the Governor may take any and all actions

reasonable and necessary to allow the Bank to continue performing its operations. The term "reasonable and necessary" is defined to include, among other things, easing restrictions on deposit reserves, suspending payments on letters of credit and extending credit, prohibiting disbursements of loans, and refusing to honor withdrawal requests unless the funds will be used for essential services. During the emergency period for a *government entity*, including the Commonwealth itself, legal actions in respect of covered obligations are stayed, and the Governor may take any and all actions that are (i) reasonable and necessary to preserve the Commonwealth's ability to continue providing essential public services, or (ii) necessary to provide for the health, safety and welfare of the residents of the Commonwealth. These actions include the ability to expropriate property in a constitutionally permitted manner through eminent domain.

The Act also contemplates that covered obligations (whether of the Bank or other government entities) will either be paid interest or accrue interest during the covered period as follows:

| | |
|---|---|
| *"Public Debt"* (full faith and credit debt protected by the Constitution) | If an *interest obligation* of the Bank or a government entity is guaranteed by the Commonwealth, or if the *interest obligation* is a full faith and credit obligation of the Commonwealth, then such interest obligation will be paid in full if due prior to July 1, 2016. Starting July 1, 2016, interest obligations that are public debt will be paid at an amount determined by the Governor after consultation with the Secretary of the Treasury that is consistent with the Constitution. There is no payment if the public debt obligation is for *principal* or if it is an *enumerated obligation* and it became due on or after July 1, 2016. |
| *Bank Deposits* | For *deposits of the Bank,* interest will accrue based on the nature of the deposits as follows: for time deposits, interest will accrue at the contractual rate until maturity and for deposits that could otherwise be withdrawn at any time, and after maturity for time deposits, interest will accrue at a rate that is the average rate of interest received by holders of the Bank's unpaid principal obligations. |
| *Principal and Interest obligations* (excluding public debt) | There will be no payment of *principal* during the emergency period unless the issuer already has funds on deposit with a trustee (or paying agent) to make such payment; unpaid principal will accrue interest at the contractual rate. Payment of principal and accrued interest on principal will be paid, to the extent permitted by applicable law, at the end of the emergency period for the Bank or government entity, if such payments become due during the emergency period, unless a voluntary restructuring or other statute is enacted. If *interest* is not paid during the covered period, it will accrue at the contractual rate. Payment of accrued interest will be paid, to the extent permitted by applicable law, at the end of the emergency period for the Bank or government entity if such payments become due during the emergency period unless a voluntary restructuring has occurred or another statute is enacted. |

| | |
|---|---|
| *Enumerated obligations* (excluding public debt) | *Enumerated obligations* may accrue interest if entitled to under any applicable agreement. |

Under certain circumstances, the Act provides something called "adequate protection" to creditors that have a legitimate security or property interest with respect to any delayed debt service payment.

## Summary of Chapters 3 and 4 of the Act

Chapters 3 and 4 of the Act contain amendments to GDB's Enabling Act consisting of updated receivership provisions (Chapter 3) and bridge bank provisions and related procedures (Chapter 4) that are intended to provide an alternative to GDB's liquidation and resolution under existing law. With respect to the *receivership* provisions, Chapter 3 of the Act would replace the outdated receivership provisions currently found in GDB's Enabling Act by establishing a set of rules better suited to confront the challenges currently faced by GDB by modifying the process for the appointment of a receiver, clarifying the receiver's powers, and establishing priorities of expenses and unsecured claims in a receivership. The priority of bondholders and depositors will remain the same as they do under existing law. With respect to the *bridge bank* provisions, Chapter 4 of the Act allows for the creation of a bridge bank, which could assume certain liabilities of the Bank, including deposits, and continue certain of the existing functions of GDB. Creditor claims that are not assumed by the bridge bank would remain at the old GDB, but all creditors shall be entitled to receive something known as a "net liquidation amount," which is the amount such creditors would have received if GDB were liquidated.

## Summary of Chapter 5

Chapter 5 of the Act would replace the outdated receivership provisions currently found in the EDB Enabling Act by modifying the process for the appointment of a receiver, clarifying the receiver's powers, and establishing priority of expenses and unsecured claims in a receivership. The amendments are intended to bring EDB's receivership provisions closer in line to the substantially similar amendments being proposed for GDB.

## Summary of Chapter 6

Chapter 6 of the Act creates a new instrumentality called the "Puerto Rico Fiscal Agency and Financial Advisory Authority," and it will be structured as an independent public corporation and public instrumentality of the Commonwealth with a board of directors composed of one appointed by the Governor. The Authority is created for the purpose of acting as fiscal agent, financial advisor and reporting agent of the Commonwealth and its public corporations, instrumentalities, commissions, authorities, municipalities and political subdivisions and to assist such entities in confronting the grave fiscal and economic emergency that the Commonwealth is currently experiencing. The Authority will also oversee all matters related to the restructuring or adjustment of any covered obligation, or otherwise coordinate and implement liability management transactions for any covered obligation.

## TABLE OF CONTENTS

                                                                           **PAGE**

CHAPTER 1      General Provisions ........................................................................ 59

        SECTION 101.      SHORT TITLE ............................................. 59

        SECTION 102.      DECLARATION OF STATE OF EMERGENCY ................... 59

        SECTION 103.      DEFINITIONS ............................................. 60

        SECTION 104.      RELATION TO CONSTITUTIONAL PROVISIONS;
                          SUPREMACY OVER OTHER LAWS ..................................... 64

        SECTION 105.      IMMUNITIES .............................................. 64

        SECTION 106.      HIRING OF GOVERNMENT WORKERS AND
                          PROFESSIONAL PERSONS; EXEMPTION FROM
                          OTHER LAWS................................................ 65

        SECTION 107.      LANGUAGE CONFLICT ...................................... 66

        SECTION 108.      PRIORITIZATION OF ESSENTIALS SERVICES............ 110

CHAPTER 2      MORATORIUM FOR GOVERNMENT ENTITIES ................................. 66

        SECTION 201.      DECLARATION COMMENCING EMERGENCY
                          PERIOD AND MORATORIUM FOR ANY
                          GOVERNMENT ENTITY; POWERS OF THE
                          GOVERNOR ................................................ 66

        SECTION 202.      CONDITIONS OF EMERGENCY PERIOD; PAYMENT
                          OR ACCRUAL OF INTEREST.................................. 68

        SECTION 203.      EMERGENCY BANK MEASURES; DEPOSITS;
                          PERMISSIBLE AND PROHIBITED WITHDRAWALS ......... 70

        SECTION 204.      COLLATERAL, SECURITY INTERESTS, AND
                          PRIORITIES PRESERVED; NON-IMPAIRMENT;
                          REMEDIES ............................................... 72

        SECTION 205.      STATUTE OF LIMITATIONS NOT TO RUN DURING
                          EMERGENCY PERIOD FOR GOVERNMENT ENTITY ....... 73

        SECTION 206.      ISSUANCE BY A GOVERNMENT ENTITY OF
                          EVIDENCE OF INDEBTEDNESS ............................. 73

CHAPTER 3      AMENDMENTS TO GDB ORGANIC ACT RELATED TO
               RECEIVERS.................................................................. 73

        SECTION 301.      AMENDMENTS TO ARTICLE 11 OF ACT NO. 17 ............. 73

        SECTION 302.      NEW ARTICLES 12 THROUGH 21 OF ACT NO. 17............ 77

CHAPTER 4      AMENDMENTS TO GDB ORGANIC ACT RELATED TO THE
               POWER TO ORGANIZE AND OPERATE A BRIDGE BANK............... 79

        SECTION 401.      NEW ARTICLE 14 OF ACT NO. 17 ......................... 79

CHAPTER 5        AMENDMENTS TO EDB ORGANIC ACT RELATED TO
                 RECEIVERS ............................................................................................ 83

     SECTION 501.    AMENDMENTS TO ARTICLE 11 OF ACT NO. 22 OF
                     JULY 24, 1985 ........................................................................ 83

     SECTION 502.    NEW ARTICLES 12 THROUGH 25 OF ACT NO. 22 OF
                     JULY 24, 1985 ........................................................................ 87

CHAPTER 6        THE PUERTO RICO FISCAL AGENCY AND FINANCIAL
                 ADVISORY AUTHORITY .......................................................................... 89

     SECTION 601.    ESTABLISHMENT ................................................................... 89

     SECTION 602.    PURPOSES, FACULTIES AND POWERS OF THE
                     AUTHORITY ........................................................................... 89

     SECTION 603.    BOARD OF DIRECTORS ......................................................... 91

     SECTION 604.    EXECUTIVE DIRECTOR ......................................................... 92

     SECTION 605.    OFFICERS AND EMPLOYEES ................................................. 93

     SECTION 606.    IMMUNITIES ......................................................................... 93

     SECTION 607.    COLLABORATION AMONG GOVERNMENT
                     ENTITIES ............................................................................... 93

     SECTION 608.    EXEMPTION FROM CERTAIN LAWS .................................... 93

     SECTION 609.    ASSUMPTION OF BANK EMPLOYEES ................................. 93

     SECTION 610.    EXISTENCE ............................................................................ 94

CHAPTER 7        Severability and Effectiveness ....................................................... 94

     SECTION 701.    SEVERABILITY ....................................................................... 94

     SECTION 702.    EFFECTIVENESS ................................................................... 94

**BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:**

### CHAPTER 1 GENERAL PROVISIONS

### SECTION 101. SHORT TITLE

This Act shall be known and may be cited as the "Puerto Rico Emergency Moratorium and Rehabilitation Act."

### SECTION 102. DECLARATION OF STATE OF EMERGENCY

It is hereby found and declared that the grave public emergency identified and declared to exist by the Legislative Assembly on numerous occasions has worsened dramatically, requiring additional measures to be taken by the Legislative Assembly, in the further exercise of its police powers, to provide for the health, safety and welfare of the residents of the Commonwealth. The Legislative Assembly has consistently sought to avert the fiscal emergency in which Puerto Rico currently finds itself through the enactment of a diverse set of legislative measures. These efforts

include Act 3-2013 (reforming the ERS), Act 160-2013 (reforming the Teachers Retirement System), Act 66-2014 (implementing special fiscal and operational measures to reduce the deficit and address the fiscal emergency), Act 71-2014 (providing certain of Puerto Rico's instrumentalities with an orderly debt restructuring mechanism), and Act 1-2015 (increasing the sales and use tax surcharge and implementing additional revenue raising measures), to name a few.

However, despite these efforts, Puerto Rico's fiscal emergency continues and indeed has become more desperate. Today, not only is the Bank threatened with a disorderly default on its outstanding obligations, but other government entities of Puerto Rico are similarly threatened by the prospect of a disorderly default on their respective obligations. In addition, adding further obstacles, failure by the United States Congress to provide Puerto Rico with an orderly regime to restructure the outstanding debt of the Commonwealth and its instrumentalities leaves Puerto Rico at the mercy of uncertainty and chaos. The people of Puerto Rico are faced with a humanitarian crisis never before experienced in Puerto Rico, or elsewhere in the United States. Simply and plainly, the grave fiscal emergency now facing Puerto Rico threatens its ability to honor its outstanding obligations while protecting the health, safety and welfare of the inhabitants of Puerto Rico. But we, as a Government, have a duty to act responsibly, in the exercise of our police powers, to provide essential government services and safeguard the interests of all of the Commonwealth's stakeholders, including its creditors.

The Legislative Assembly hereby finds that asking the Commonwealth government, its instrumentalities, and the inhabitants of Puerto Rico to continue shouldering by themselves the burdens of the Governor of Puerto Rico's grave fiscal emergency is unsustainable and would further damage the economy of Puerto Rico to the detriment of every stakeholder of the Commonwealth, including its creditors. The Governor of Puerto Rico must also be authorized and directed to honor his duty to provide for the health, safety and welfare of the residents of the Commonwealth by granting him emergency police powers under this Act to declare a temporary moratorium of debt payments. These measures will positively enhance the Commonwealth's and the other government entities' ability to honor their outstanding debt obligations. Otherwise, the potential catastrophic effects of allowing creditors to exercise their enforcement remedies would undeniably harm the health, safety and welfare of the residents of the Commonwealth. Likewise, it could further impair creditors' ability to recover on their claims.

### SECTION 103. DEFINITIONS

The following words and terms, when used in chapters 1, 2, 6, and 7 of this Act shall have the meaning stated below:

(a) "Act" shall mean this Puerto Rico Emergency Moratorium and Rehabilitation Act.

(b) "AFICA" shall mean the Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority.

(c) "AMA" shall mean the Metropolitan Bus Authority.

(d) "Authority" shall mean the Fiscal Agency and Financial Advisory Authority.

(e) "Available resources" shall have the meaning given to such term for purposes of Section 8 of Article VI of the Constitution of the Commonwealth.

(f) "Bank" shall mean either or both of—

    i. the Government Development Bank for Puerto Rico, and for the purpose of Section 201(b)(i) and (ii) of this Act, it shall also include its employees, officers, directors, agents, and professional advisors; and

    ii. the Economic Development Bank for Puerto Rico, and for the purpose of Section 201(b)(i) and (ii) of this Act, it shall also include its employees, officers, directors, agents, and professional advisors.

(g) "Board" shall mean the Board of Directors of each Bank and the Authority.

(h) "CCDA" shall mean the Puerto Rico Convention Center District Authority.

(i) "Children's Trust" shall mean the not-for-profit entity created by the Commonwealth pursuant to the Children's Trust Law, Act No. 173-1999, as amended.

(j) "COFINA" shall mean the Puerto Rico Sales Tax Financing Corporation.

(k) "Commonwealth" means the Commonwealth of Puerto Rico.

(l) "Covered obligation" shall mean (1) any interest obligation, principal obligation or enumerated obligation of a government entity that is due or becomes due during the emergency period in respect of such government entity, (2) any obligation arising or resulting from, or related to, the guarantee by such government entity of any obligation of another entity that is due or becomes due during the emergency period, and (3) if provided for in an order issued pursuant under Section 201(c) of this Act, the transfer of, or obligation to transfer, funds required to be made in advance of, or on the due date of, any obligation identified in the preceding clauses (1) and (2), if, and in each case, such government entity, as applicable, is declared to be in a state of emergency by an executive order of the Governor as contemplated in Section 201(a) of this Act, as may be amended from time to time, but shall not include—

    i. any obligation of an insurer to pay on any policy related to any interest obligation, principal obligation or enumerated obligation that would have come due as provided for in any law or document as if this Act had not been enacted;

    ii. any obligation (or portion thereof), unless otherwise provided in such executive order, the payment of which can be made solely from money that has been deposited with a trustee or other custodian prior to the commencement of the emergency period for such obligor, which money is pledged for the sole purpose of paying such obligation (or portion thereof) when it becomes due;

    iii. any obligation of AFICA, with the exception of the Educational Facilities Revenue Bonds, 2000 Series A (Educational Plaza Project) issued pursuant to a trust agreement, dated as of December 1, 2000, as amended, by and between The Bank of New York Mellon, as trustee, and AFICA;

    iv. any obligation of a bridge bank created under chapter 4 of this Act, and

    v. any debt issued by a government entity after the enactment of this Act provided that the Governor certifies at the time of issuance that such debt will be excluded from the definition of "covered obligation" under this Section for the purposes of this Act.

(m)  "Covered period" means the period beginning immediately upon the effectiveness of this Act through and including January 31, 2017, which period may be extended by executive order of the Governor for not more than two months.

(n)  "Debt instrument" shall include any document or instrument for, used in connection with, or related to:

　　i.  any obligation to pay the principal of, premium of, if any, interest on, penalties, reimbursement or indemnification amounts, fees, expenses, or other amounts relating to any indebtedness, and any other liability, contingent or otherwise,

　　　　a.  for borrowed money,

　　　　b.  evidenced by bonds, debentures, indentures, notes, resolutions, credit agreements, trade finance agreements, trade finance facility agreements, securities, or similar instruments, or

　　　　c.  for any letter of credit or performance bond;

　　ii.  any contingent obligation in respect of or related to any liability of the kind described in the preceding clause (i), including, but not limited to, any guaranty of such liability and any reimbursement agreement in respect of an insurance policy covering such liability;

　　iii.  any obligation in respect of bankers' acceptances;

　　iv.  any obligation in respect of a swap agreement, derivative contract or related agreement, hedge agreement, securities contract, forward contract, repurchase agreement, option, warrant, commodities contract, or similar document;

　　v.  any and all deferrals, renewals, extensions, and refunding of, or amendments, modifications, or supplements to, any liability of the kind described in any of the preceding clauses (i) through (iv);

　　vi.  any liability arising out of any judgment relating to any liability of the kind described in any of the preceding clauses (i) through (v); or

　　vii.  any liability arising from an obligation of insurance relating to any liability of a kind described in this section.

(o)  "Depositor" shall mean any person, or authorized representative thereof, who is the primary or beneficial owner of any account containing deposits held by the Bank.

(p)  "Deposit" shall mean funds held by the Bank that are classified by such Bank as deposits.

(q)  "Emergency period", in respect of any government entity, shall mean the period beginning on the date designated by the Governor in an executive order, as may be amended from time to time, issued pursuant to Section 201(a) of this Act, with respect to such government entity and ending on the last day of the covered period.

(r)  "Enumerated obligation" shall mean any obligation specifically listed or identified by category in an executive order, as may be amended from time to time, issued pursuant to Section 201(a) of this Act, which obligation (whether contingent or non-contingent, due or not due) may arise from any contract or agreement, including any financial

instrument, debt instrument or unexpired lease, any obligation to pay the principal of, premium of, if any, penalties, reimbursement or indemnification amounts, fees, expenses, or other amounts relating to any indebtedness, any other liability, contingent or otherwise, and any other agreement or instrument providing for amounts or benefits due by a government entity to any person, provided that an "enumerated obligation" shall not include any principal obligation or interest obligation due by such government entity.

(s)   "ERS" shall mean the Employees Retirement System of the Government of the Commonwealth of Puerto Rico and its Instrumentalities.

(t)   "Government entity" shall mean any of the following—

    i. AFICA, AMA, each Bank, CCDA, Children's Trust, COFINA, the Commonwealth, ERS, HFA, HTA, MFA, PBA, PFC, PRASA, PREPA, PRIDCO, PRIFA, and UPR; and

    ii. the employees, officers, directors, agents, or professionals of any government entity listed in the preceding clause (i) when the term is used in Section 201(b)(i) and (ii) of this Act.

(u)   "Governor" shall mean the Governor of the Commonwealth.

(v)   "HFA" shall mean the Puerto Rico Housing Finance Authority.

(w)   "HTA" shall mean the Puerto Rico Highways and Transportation Authority.

(x)   "Interest obligation" shall mean any obligation arising under or related to the payment of interest on any debt instrument but shall not include any interest obligation determined by the Governor, in his sole discretion, and identified in an executive order, as may be amended from time to time, issued pursuant to Section 201(a) of this Act, as not being an interest obligation for the purposes of this Act.

(y)   "Minimum public debt payment" shall mean, with respect to a covered obligation that is public debt and an interest obligation—

    i. an amount determined by the Governor that is consistent with the Constitution of the Commonwealth, after consultation with the Secretary of the Treasury, which amount may be calculated as the difference between the amount of available resources projected for the applicable emergency period and the projected expenses for essential public services during such period, applied pro rata to all holders of covered obligations that are interest obligations that constitute public debt that are due and payable (or projected to become due and payable) during the applicable emergency period (excluding any deferred or accrued amounts that will be paid on the last day of such emergency period as a result of this Act), provided that the minimum public debt payment in this clause (i) need not be paid all at once if such amount exceeds the available resources of the Commonwealth that are available to make such payment, including those subject to an executive order or applicable law that diverts such available resources towards the payment of public debt; and

    ii. the full amount of such obligation if such obligation is due prior to June 30, 2016.

(z)   "MFA" shall mean the Puerto Rico Municipal Finance Agency.

(aa)  "PBA" shall mean the Puerto Rico Public Buildings Authority.

(bb)  "Person" shall mean any natural person or legal entity, including, but not limited to, any government agency, department, instrumentality, public corporation, municipality, board, office, committee or dependency or any public or private individual, firm, partnership, stock company, limited liability company, association or corporation organized and existing under the laws of the Commonwealth, the United States of America or any of its states, or of any foreign country, or any combination of the above.

(cc)  "PFC" shall mean the Puerto Rico Public Finance Corporation.

(dd)  "PRASA" shall mean the Puerto Rico Aqueduct and Sewer Authority.

(ee)  "PREPA" shall mean the Puerto Rico Electric Power Authority.

(ff)  "PRIDCO" shall mean Puerto Rico Industrial Development Company.

(gg)  "PRIFA" shall mean the Puerto Rico Infrastructure Financing Authority.

(hh)  "Principal obligation" shall mean any obligation arising under or related to the payment of principal of any debt instrument but shall not include any principal obligation determined by the Governor, in his sole discretion, and identified in an executive order, as may be amended from time to time, issued pursuant to Section 201(a) of this Act, as not being a principal obligation for the purposes of this Act.

(ii)  "Public debt" shall mean any obligation or evidence of indebtedness of the Commonwealth, or a government entity, that is issued or guaranteed by the Commonwealth pursuant to the authority provided in Section 2 of Article VI of the Constitution of the Commonwealth, for the payment of which the good faith, credit and taxing power of the Commonwealth shall have been pledged.

(jj)  "UPR" shall mean the University of Puerto Rico.

## SECTION 104. RELATION TO CONSTITUTIONAL PROVISIONS; SUPREMACY OVER OTHER LAWS

This Act has been enacted pursuant to and in accordance with the police powers of the Commonwealth of Puerto Rico.  In the event that the provisions of this Act are in conflict with the provisions of any other law, the provisions of this Act shall prevail.

## SECTION 105. IMMUNITIES

(a)  Except to the extent proven by final and unappealable judgment to have engaged in willful misconduct for personal gain or gross negligence comprising reckless disregard of applicable duties, no person shall have any liability, civil, criminal, or otherwise, for, and without further notice or order shall be exonerated from, actions taken or not taken in their capacity, and within their authority in connection with, related to, or arising under, or as permitted under this Act, nor for any transfer, sale or assignment of assets or withdrawal of funds approved or executed by any government entity prior to or after the enactment of this Act if any such transfer, sale, assignment or withdrawal of deposits or other funds, as applicable, is found by a court to be in violation of this Act or Act No. 17 of September 23, 1948, as amended, sections 1243, 1244 and 1249 of the Civil Code of Puerto Rico, or any other similar or analogous law or provision.

(b) Any action brought for gross negligence shall be dismissed with prejudice if: (i) a defendant, as an official, officer, director, committee member, or professional produces documents showing in respect of whatever acts or omissions form the basis of the complaint, such defendant received or relied on the advice of experts or was advised of relevant facts, participated in person or by phone, and deliberated in good faith; or (ii) the acts or omissions that form the basis of the complaint, indictment, or information do not clearly violate an established duty of which a reasonable person would have clear notice under the particular circumstances.

### SECTION 106.  HIRING OF GOVERNMENT WORKERS AND PROFESSIONAL PERSONS; EXEMPTION FROM OTHER LAWS

(a) At any time during an emergency period, the following acts or provisions thereof shall not apply to the hiring by the Governor, the Department of the Treasury, PRIFA, any subsidiary of the Bank, and/or the Authority, on a temporary or permanent basis, of any individual that is employed by the Bank or any other government entity to work in the Governor's office, the Department of the Treasury, PRIFA, any subsidiary of the Bank, and/or the Authority on matters related to the restructuring of any covered obligation or adjusting of any covered obligation, implementing liability management transactions for covered obligations, managing the fiscal affairs of the Commonwealth or any government entity, or any matters otherwise related to functions or operations performed or carried out by the Bank under Act No. 17 of September 23, 1948, as amended, or Act No. 272 of May 15, 1945, as amended—

    i. the "Public Service Human Resources Administration Act of the Commonwealth of Puerto Rico," Act No. 184-2004, as amended;

    ii. the "Act to Regulate the Transition Process of the Government of Puerto Rico," Act No. 197-2002, as amended;

    iii. Articles 6 through 11 of Act 66-2014, known as the "Fiscal Sustainability Act";

    iv. items (b) and (c) of Article 4.6 of Act No. 1-2012, as amended, known as the "Puerto Rico Government Ethics Act of 2011";

    v. the "Commonwealth of Puerto Rico Government Fiscal Reform Act of 2006", Act No. 103-2006, as amended;

    vi. Act No. 164 of July 23, 1974, as amended, known as the "General Services Administration Act"; and

    vii. Article 2.001 of Act 78-2001, as amended, known as the "Commonwealth of Puerto Rico Electoral Law."

(b) The Governor, the Department of the Treasury, PRIFA, any subsidiary of the Bank, and/or the Authority may employ, retain, or honor existing obligations under and/or assume existing contracts of the Bank with consultants and essential employees, including legal and financial advisors, whether or not the salaries or fees were incurred prior to the date of such assumption, to advise the Governor, the Bank or any government entity on matters related to restructuring or adjusting any covered obligation, implementing liability management transactions for covered obligations, managing the fiscal affairs of the Commonwealth and any government entity, or any matters otherwise related to functions or operations performed or carried out by the Bank under Act No. 17 of September 23, 1948, as amended, or Act No. 272 of May 15, 1945, as amended.  The Governor, the Department of the Treasury, PRIFA, any

subsidiary of the Bank, and/or the Authority, as applicable, shall submit to the Office of Management and Budget an estimate of the total costs and expenses related to the contracts and obligations to be incurred or assumed pursuant to this Section for the remainder of this fiscal year 2016. The Secretary of the Treasury and the Director of the Office of Management and Budget are hereby directed to identify from the fiscal year 2016 budget the funds necessary to cover such expenses and/or to transfer to PRIFA, any subsidiary of the Bank, or the Authority sufficient funds to cover such expenses. Beginning in fiscal year 2017, such expenses shall be paid from appropriations made by the Legislative Assembly.

### SECTION 107. LANGUAGE CONFLICT

This Act shall be adopted both in English and Spanish. If in the interpretation or application of this Act any conflict arises as between the English and Spanish texts, the English text shall govern.

### SECTION 108. PRIORITIZATION OF ESSENTIAL SERVICES

It is the Legislative Assembly's finding that, given the Commonwealth's ongoing fiscal crisis, during this extraordinary emergency period the Government should prioritize the payment of essential services over debt service not only to provide for the health, safety and welfare of the residents of the Commonwealth but also to avoid a further economic downturn and fiscal and humanitarian crisis that would ultimately materially worsen the creditor's recovery on their Puerto Rico bonds.

### CHAPTER 2 MORATORIUM FOR GOVERNMENT ENTITIES

### SECTION 201. DECLARATION COMMENCING EMERGENCY PERIOD AND MORATORIUM FOR ANY GOVERNMENT ENTITY; POWERS OF THE GOVERNOR

(a)     Consistent with Section 108, the Legislature hereby directs the Governor to prioritize payment of essential services over covered obligations to promote the health, safety, and welfare of the residents of the Commonwealth during such covered period, as defined in this Act, and the Governor is hereby empowered, by executive order, to declare the Bank or any government entity to be in a state of emergency and identify in such order enumerated obligations of the Bank or any government entity, as applicable, and if the executive order so provides, no payment on a covered obligation of such Bank or government entity shall be made, other than as provided in sections 202 or 204 of this Act, during the emergency period for such Bank or government entity, as applicable. Any executive order issued under this subsection may be terminated or modified at any time by the Governor.

(b)     During the emergency period for any government entity—

i. no act shall be done, and no action or proceeding, including issuance of process, shall be commenced or continued in any court in any jurisdiction, which could result in—

A.     the recovery from, or judgment or enforcement against such government entity related to any covered obligation, or any funds, property, receivables or revenues thereof;

B.     any order, judgment, lien, set-off, right of attachment or counterclaim related to any covered obligation against such

government entity, or the indebtedness or liability evidenced thereby; or

C.    the application of any funds, property, receivable or revenues of such government entity related to any covered obligation of such government entity, or the indebtedness or liability evidenced thereby;

ii.  no entity or person asserting claims or other rights (including a beneficial or assignable interest), no trustee, no collateral agent, no indenture trustee, no fiscal agent, no insurer, and no financial institution that receives or holds funds from such government entity may exercise any remedy, which remedy shall include any right of acceleration or termination, right of set-off, right of attachment or counterclaim related to any covered obligation of such government entity, under any contract or applicable law as a result of—

A.    non-payment of any obligation arising under or related to any covered obligation of such government entity;

B.    breach of any condition or covenant under or related to any covered obligation of such government entity;

C.    the accrual of any right that is conditioned upon the financial condition of, or the commencement of a restructuring, insolvency, bankruptcy, or other proceeding, or a moratorium by, such government entity, including a default or an event of default thereunder; or

D.    the presentment or approval of this Act or any similar legislation, including moratorium legislation;

iii.  no contract to which such government entity is a party may be terminated or modified, nor may any right or obligation under such contract be terminated or modified solely because of a provision in such contract conditioned on—

A.    the insolvency or financial condition of such government entity;

B.    the commencement of a restructuring, insolvency, bankruptcy, or other proceeding, or a moratorium by such government entity; or

C.    a default under a separate contract that is due to, triggered by, or as the result of the occurrence of the events or matters in subsections (ii)(A), (ii)(B), (ii)(C), or (ii)(D) of this section; and

iv.  notwithstanding the provisions of the preceding clauses (i), (ii) and (iii) above, the Governor may take any and all actions that are reasonable and necessary to preserve the Commonwealth's ability to continue providing essential public services and may take any and all actions reasonable and necessary to protect the health, safety and welfare of the residents of the Commonwealth, including, in each case without limitation, expropriating property or rights in property interests related to a covered obligation in a constitutionally permitted manner pursuant to the Commonwealth's power of eminent domain, provided, however, that if property is taken pursuant

to this Act, just compensation or other relief may be sought in the Court of First Instance, San Juan Part notwithstanding any other provision or this Section of this Act. The provisions of the General Act of Expropriation of March 12, 1903, as amended, other than Articles 3 and 3(a), and the requirement of Article 5(a) that funds be deposited in court prior to acquiring title and possession of the property being expropriated, will apply to expropriations pursuant to this section.

(c)     Any act found to violate subsection (b) of this Section shall be void and punishable by contempt of court. Any person or entity found to violate this Section may also be liable to such government entity for damages, costs, and attorneys' fees incurred by the Governor or such government entity in defending against actions taken in violation of this Section, and punitive damages for intentional or knowing violations, and upon determining that there has been a violation of this section, the court may order additional appropriate remedies.

(d)     If ordered by the Governor during the emergency period created by this section, the following obligations may be suspended or modified, if applicable, until the end of the covered period, without the need for further legislation,—

      i. any statutory or other obligation to appropriate money to pay or secure any covered obligation or request the inclusion of an appropriation in the Commonwealth's proposed budget to pay or secure any covered obligation (or take any action in furtherance thereof);

      ii. any statutory or other obligation to transfer money (or its equivalent) to pay or secure any covered obligation (or take any action in furtherance thereof);

      iii. any statutory or other obligation to setoff revenues used to pay or cover, directly or indirectly, a covered obligation that would normally be used or effected to pay or secure any covered obligation (or take any action in furtherance thereof); and

      iv. any statutory or other obligation to ensure payment of a covered obligation as if this Act were not enacted (or take any action in furtherance thereof).

(e)     During the covered period, notwithstanding Section 4(c) of Act No. 147 of June 18, 1980, as amended, the Governor may reprioritize services and expenses described in Section 4(c)(3) to higher payment priority than as listed in Section 4(c).

(f)     Nothing in this Section shall be read or construed to limit the authority of any government unit or agency to commence or continue any regulatory proceeding to enforce such governmental unit's or agency's police or regulatory power as it relates to a covered obligation.

## SECTION 202. CONDITIONS OF EMERGENCY PERIOD; PAYMENT OR ACCRUAL OF INTEREST

(a)     If provided for in an executive order, as may be amended from time to time, issued pursuant to Section 201(a) of this Act, during the emergency period for any government entity created by this chapter,—

      i. holders of a covered obligation of such government entity—

<div style="margin-left:2em">

A.     that constitutes public debt and is an interest obligation shall receive at least the minimum public debt payment;

B.     that does not constitute public debt but is an interest obligation shall be entitled to have the unpaid portion of the interest obligation accrue interest at a rate equal to the contract rate of interest, which shall be paid at the end of the covered period to the extent permitted by otherwise applicable law; and

C.     that is a principal obligation shall be entitled to have the unpaid portion of the principal obligation accrue interest at a rate equal to the contract rate of interest, which unpaid principal and accrued and unpaid interest shall be paid at the end of the covered period to the extent permitted by otherwise applicable law;

ii. interest shall accrue on an enumerated obligation as provided in any applicable agreement or contract.

</div>

(b)     Notwithstanding any other provision of this section, no holder of a covered obligation that is not public debt shall receive payment as otherwise required by this Section from available resources if any portion of an obligation that is public debt remains due, outstanding, and unpaid.

(c)     Unless provided in the executive order, as may be amended from time to time, issued pursuant to Section 201(a) of this Act, or unless otherwise paid prior to the end of the covered period, any payments due in respect of any covered obligation of any government entity that comes due before or during the covered period for which an emergency period has been declared, including accrued interest, or arising or resulting from, or related to, the failure to pay such obligation (whether arising or resulting from a guarantee, reimbursement, indemnity or other obligation of, or undertaking by any government entity), shall, unless otherwise provided for under this Act, be paid on the last day of the covered period to the extent permitted by otherwise applicable law.

(d)     The requirements to pay interest pursuant to subsections (a) and (b) of this Section shall not apply to the payment of any portion of a covered obligation that is not public debt the payment of which is—

<div style="margin-left:2em">

i. subject to appropriation of funds for the purpose of making such payment by the Legislative Assembly; and

ii. made solely from available resources that have been diverted pursuant to an executive order or applicable law towards the payment of public debt, if any portion of any obligation that constitutes public debt is due and owing and remains unpaid.

</div>

(e)     Notwithstanding any other provision of this Act, a holder of any covered obligation may make an application to the Court of First Instance of the Commonwealth, San Juan Part, upon thirty days' written notice to the government entity seeking an order enforcing the provisions of this Section 202 unless such order would unreasonably endanger the health, safety and welfare of the residents of the Commonwealth.

## SECTION 203. EMERGENCY BANK MEASURES; DEPOSITS; PERMISSIBLE AND PROHIBITED WITHDRAWALS

(a)     At any time during the covered period, regardless of whether the Bank has covered obligations, the Governor is authorized to take any and all actions that are reasonable and necessary to allow the Bank to continue carrying out its operations.

(b)     For the purposes of this section, actions that are "reasonable and necessary" shall include, but are not limited to, the following—

    i. prescribing such conditions or restrictions for the conduct of the business of the Bank, including dispensing with the compliance, in whole or in part, of any requirement prescribed by otherwise applicable law, including those that require the Bank to maintain deposit reserves above a certain threshold;

    ii. ordering the limitation of any payment of any obligation pursuant to terms the Governor prescribes to address the Bank's liquidity needs or facilitate the Bank's ability to carry out its operations;

    iii. suspending—

        A.     payments on any obligation guaranteed by the Bank;

        B.     payments on any letter of credit; and

        C.     any obligation or commitment to lend or extend money or credit;

    iv. taking any action with respect to the Bank as provided for in Act No. 17 of September 23, 1948, as amended; and

    v. delegating to the Bank, its Board, or its employees authority to take actions in furtherance of this Section.

(c)     If any restriction is placed on disbursements by the Bank pursuant to subsection (a) of this Section,—

    i. the Bank shall not be permitted to disburse any loans unless authorized by the Governor;

    ii. the Bank shall honor requests to withdraw or transfer any deposit, including by check or other means, of an agency, public corporation, or instrumentality of the Commonwealth (other than those listed in subsection (c)(iii) of this subsection) as may be authorized by the Governor, from time to time, and in making any such authorization, the Governor shall consider the availability of funds and the need to fund the provision of essential services by such depositor, which must be demonstrated by a joint certification from the Office of Management and Budget and the Secretary of the Treasury that honoring such request, with respect to such deposit, is necessary to fund the provision of specifically identified essential services by a government entity, provided, further, that when certifying such withdrawal requests, the Office of Management and Budget and the Secretary of the Treasury may reduce the amount of any request to an amount deemed necessary to fund essential services; and

   iii.  subject to the availability of funds and the aggregate disbursements established by the Governor, the Bank shall honor any request to withdraw or transfer any deposit held by, or request to honor any check written by, a municipality or any of the Judicial Branch, UPR, Legislative Branch, Office of the Comptroller, Office of the Electoral Comptroller, State Elections Commission, Government Ethics Office, Independent Prosecutors Panel, provided, however, that an authorized officer of such municipality or listed entity certifies along with supporting documentation that such funds will be used for the payment of essential services.

(d)    During the covered period, deposits shall accrue interest at a rate—

   i.  equal to the contract rate but only to the extent that the depositor's ability to withdraw such deposits is limited by other laws or contract and not solely by this Act; or

   ii.  equal to the average interest rate applicable to the unpaid principal obligations of the Bank, if—

     A.   such deposits could be withdrawn at any time but for the operation of this Act, or

     B.   such deposits would otherwise become eligible for withdrawal during the emergency period but for the operation of this Act.

(e)    Except as provided in subsection (f) of this section, if any restriction is placed on disbursements from the Bank pursuant to this section, then any value disbursed to a creditor after such restriction is imposed shall be subtracted from the value of any distribution that such creditor is entitled to receive, as of the first date of the restriction, if the Bank is subsequently liquidated or placed into a receivership.

(f)    Disbursements made by the Bank before or during the covered period that are made in the ordinary course, including disbursements to cover expenses of the nature described in Article 12 Section (A)(2) or (3) of Act No. 17 of September 23, 1948, as amended by this Act, or to pay for goods and services provided to the Bank, shall, for the avoidance of doubt, in each case, be exempt from Article 14 of Act No. 17 of September 23, 1948, as amended (renumbered as Article 17 pursuant to Section 302 of this Act).

(g)    Any and all actions undertaken pursuant to sections 201, 202, and 203 of this Act shall expire at the end of the covered period.

(h)    Any check written in violation of this Act or an executive order issued pursuant to it shall be null and void, and any person that intentionally writes a check to withdraw all or a substantial portion of their deposit balance in violation of this Section shall be guilty of a felony punishable by imprisonment for up to one (1) year or by a fine of not less than twenty-five thousand dollars ($25,000).

(i)    The Secretary of Treasury of the Commonwealth and the Director of the Office of Management and Budget are hereby authorized to identify from the fiscal year 2016 General Fund budget the funds necessary to cover essential governmental needs that would have otherwise been funded during fiscal year 2016 from disbursements from GDB loans subject to the restrictions included in Section 203(c)(1) of this Act.

(j)     The Secretary of the Treasury of the Commonwealth and the Director of the Office of Management and Budget are directed to identify from the fiscal year 2016 general fund budget, $2,000,000 to fund the costs of the commission of the integral public credit created by Act No. 97-2015.

### SECTION 204.  COLLATERAL, SECURITY INTERESTS, AND PRIORITIES PRESERVED; NON-IMPAIRMENT; REMEDIES

(a)     If a covered obligation that was otherwise or became due before or during an emergency period becomes payable at the end of the covered period as a result of this Act, and unless an expropriation has occurred in accordance with this Act, nothing in this Act shall be construed to limit the rights of a holder to any collateral, security interest, or lien that secures such obligation, and nothing in this Act authorizes any government entity to compromise any obligation over the objection of a creditor.

(b)     Unless property has been expropriated in accordance with this Act, on motion of a party in interest and after notice and a hearing, the Court of First Instance of the Commonwealth, San Juan Part, may grant any party in interest with security or property rights, to the extent required by applicable constitutional law, adequate protection of any security or other interest in property of such party in interest resulting from actions taken or not taken in furtherance of this Act, provided, however, that nothing in this Act prohibits any government entity from arguing in favor of abstention, if applicable, or that adequate protection is not required, or requires a court to provide adequate protection if adequate protection is not constitutionally required.

(c)     When a person's right or interest in property is entitled to adequate protection, it may be provided by any reasonable means, including—

     i.     cash or periodic cash payments; or

     ii.     a replacement lien or liens (on future revenues or otherwise),

in each case, solely to the extent this Act results in a decrease in value of such entity's interest in property subject to the lien as of the declaration of an emergency period under this Act.

(d)     Without limiting subsection (b) of this section, adequate protection of a person's interest in cash collateral, including revenues, of the government entity, may take the form of a pledge to such person of future revenues (net of any current expenses, operational expenses or other expenses incurred under this Act) of such government entity if—

     i.     the then-current enforcement of such person's interest would substantially impair the ability of such government entity to perform its public functions;

     ii.     there is no practicable alternative available to fulfill such public functions in light of the circumstances; and

     iii.     the generation of future net revenues to repay such person's secured claims is dependent on the then-current continued performance of such public functions and the future net revenues will be enhanced by the then-current use of cash collateral or revenues to avoid then-current impairment of public functions.

(e)     Without limiting subsections (c) and (d) of this section, a government entity may recover from or use property securing an interest of a person the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to such person,